# Memphis & Charleston Railroad Co. v. Woods.

*Bill in Equity by Stockholders of Railroad Corporation, for Injunction against Voting at Election of Directors.*

1. *Directors of corporation as trustees.*—The directors of a private corporation, although not technically trustees, occupy a fiduciary relation, and are required to exercise their best care and judgment in the interest of the corporation; and they can not be allowed to exercise the powers confided to them, to the detriment of the corporation, in advancement of their own private interest, or the interest of another corporation in which they are stockholders.

2. *Election of directors; injunction against majority voting, at suit of minority of stockholders.*—One railroad corporation having procured by

[Memphis & Charleston Railroad Co. v. Woods.]

purchase a majority of the stock of another, not parts of the same continuous line, and used its controlling power in the election of a majority of the directors from its own board of directors, and oppressed and defrauded the latter in the management of its business affairs—buying unnecessary rolling-stock, making unnecessary repairs at exorbitant charges, unduly apportioning the earnings fiom freight and travel, and otherwise increasing its own profits while diminishing the net profits of the other company—a court of equity will interfere by injunction, at the suit of the minority of the stockholders, to prevent said controlling corporation, or any one acting in its interest, from voting its stock at an election of directors. (McCLELLAN, J. dissenting.)

3.  *When stockholders may maintain suit against corporation.*—A minority of the stockholders of a corporation may maintain a bill in equity to prevent illegal action on the part of the majority, after request to the proper officers to interfere, and their failure or refusal to do so; and where the illegal action complained of or threatened is on the part of a majority of the directors, acting in the interest of another corporation of which they are also directors, such previous request, it seems, would be unnecessary, since it would be unavailing.

. 4  *Allegations on information and belief.*—A fact may be alleged on information and belief, without positive knowledge; but an allegation that complainant "is informed and believes," not adding that the information is true, is not sufficient.

·   APPEAL from the Chancery Court of Madison.

.    Heard before the Hon. THOMAS COBBS.

The bill in this case was filed on the 27th October, 1887, by William Henry Woods and others, stockholders of the Memphis & Charleston Railroad Company, against the said corporation, and against the East Tennessee, Virginia & Georgia Railroad Company; and sought to restrain and enjoin the latter corporation from voting the stock held by it in the former, which was a majority of all the stock, at an election for directors to be held on the 17th November then next, or allowing any other person to vote said stock for it, or in its name.   Each of the defendants demurred to the bill, assigning several grounds of demurrer, and each submitted a motion to dismiss it for want of equity.   The chancellor overruled the demurrer and the motion, and his decree is here assigned as error by the defendants jointly.

R. C. BRICKELL, for the East Tenn., Va. & Ga. Railroad Company, and HUMES, WALKER, SHEFFEY & GORDON, for the Memphis & Charleston Railroad Company, appellants, submitted printed arguments, in which they cited the following authorities:   Green's Brice's *Ultra Vires*, 693; Taylor's Law of Corporations, §§ 151, 281; *Bissell v. Railroad Co.*, 22 N. Y. 258; *Mickles v. Bank*, 11 Paige, 118; *Insurance Co. v. Page*, 18 B. Mon. 413; *Gordon v. Preston*, 1 Watts, 385; 1 Mor. Corp. §§ 477, 651; 57 Ill. 416; 5 Blatch. 525;

*Ryder v. Railroad Co.*, 13 Ill. 516; *Reid v. Jones*, 6 Wisc. 680; *C. & A. R. R. Co. v. Elkins*, 37 N. J. Eq. 273; 42 Conn. 560; *Hoppin v. Buffman*, 9 R. I. 513; *Deadrick v. Wilson*, 8 Baxter, 120; *Hyatt v. Allen*, 56 N. Y. 553; High Inj. §§ 7, 8, 22, 28; 43 Conn. 500; 1 Halst. Ch. 379; *Cooke on Stock*, § 665; *Nat. Bank v. Mathews*, 98 U. S. 628; *Reynolds v. Bank*, 112 U. S. 413; *Nat. Bank v. Whitney*, 103 U. S. 99; *Railroad Co. v. Ellerman*, 105 U. S. 173; 1 Wood's Railway Law, 518; 3 Pom. Equity, § 1339; 119 Mass. 147; 45 Mich. 103; 96 U. S. 258; *Hawes v. Oakland*, 104 U. S. 450; *Moses v. Tompkins*, 84 Ala. 616; *Nathan v. Tompkins*, 82 Ala. 446; 22 Moaks, Eng. 645; 90 N. Y. 58.

JNO. W. WEED, and JNO. M. McKLEROY, *contra*, cited *Milbank v. Railroad Co.*, 64 How. Pr. 20; *Franklin Bank Co. v. Lewiston Bank*, 68 Maine, 43; *Railroad Co. v. Collins*, 40 Geo. 582; *Hazelhurst v. Railroad Co.*, 43 Geo. 13; *Wilks v. Geo. Pac. Railway*, 86 Ala. 479; 34 Fed. Rep. 615; *Nathan v. Tompkins*, 82 Ala. 437; *Hinckley v. Gildersleeve*, 19 Gr. Canada, 212; 37 Fed. Rep. 449; 19 Abbott's N. Cases, 456; 14 N. J. Eq. 381; 141 Mass. 535; 15 A. & E. Railroad Cases, 82; Mor. Corp., § 523.

STONE, C. J.—This suit was commenced October 27, 1887, and is prosecuted by stockholders of the Memphis & Charleston Railroad Company, .representing a minority of the stock.

The case was submitted in the court below on a demurrer to the bill, and on a motion to dismiss it for want of equity. From the chancellor's decree overruling the demurrer, and refusing to dismiss the bill, or to dissolve the injunction, the present appeal is prosecuted. Coming before us in this form, we must treat as true all the averments of the bill which are well pleaded, and in the further progress of this opinion they will be stated as facts.

The Memphis & Charleston Railroad was constructed under charters obtained from the States of Tennessee and Alabama, and extends from Memphis in Tennessee to Stevenson in Alabama, running partly through Mississippi. One hundred and fifty miles of the track are in Alabama. The entire length of the road is not shown. The capital stock is $5,312,725, divided into 212,509 shares, of $25 each. Of these shares, 106,261—being a majority of the whole num-

[Memphis & Charleston Railroad Co. v. Woods.]

ber—stand on the books in the name of the East Tennessee, Virginia & Georgia Railway Company, another corporation, which does not connect with or touch the Memphis & Charleston Railroad at any point. The complainants hold eight thousand and eight hundred of the shares, representing two hundred and twenty thousand dollars of the capital stock, and they sue in their names, and in the names of such other of the stockholders as may join in the suit.

The Memphis & Charleston Railroad has been in operation for a third of a century. The profits of the corporation, if any, prior to the time of its passing under the control of the East Tennessee, Virginia & Georgia Railroad Company, hereafter shown, we have no certain means of ascertaining, further than that from June, 1858, two years after the completion of the road, to June, 1861, the net earnings were never less than ten, and once as high as sixteen per cent. We have no account of any earnings during the civil war—from 1861 to 1865—and suppose, not only that there were no net profits, but that the cessation of hostilities left the road very much out of repair. Extraordinary expenditures became necessary to repair and equip the road, and up to June 30, 1867, the expenditures exceeded the receipts. During the years ending June, 1868, to June, 1874, surplus profits, amounts not shown, were earned by the road each year, except the two years 1871 and 1872. The sum of the deficiency for these two years was about one hundred and fifty thousand dollars.

The East Tennessee, Virginia & Georgia Railroad Company obtained its charters from the States of Tennessee and Alabama, and had been many years in operation. It extended easterly far beyond Knoxville, Tennessee; and having absorbed, or otherwise obtained control of the Selma, Rome & Dalton Railroad, an Alabama corporation, extended in a south-western direction one hundred and fifty miles or more into Alabama, terminating at Selma in this State. It also operated a line which touched at Chattanooga in the State of Tennessee, eastward from Stevenson, and distant from it twenty-five or more miles. There was, however, a connecting line between the respective termini, but it belonged to another railroad corporation. The E. T., V. & Ga. R. R. Company had probably many other extensions and connections, not necessary to be noticed here. The extent, distances and connections of the East Tennessee, Virginia & Georgia Railroad Company are stated partly on general knowledge,

[Memphis & Charleston Railroad Co. v. Woods.]

About 1874, one Wilson was elected president of the Memphis & Charleston Railroad Company, and was continued in the office until 1881. His election was procured through the instrumentality of the East Tennessee, Virginia & Georgia Railroad Company, and although not exactly coterminous, the two railroads have been operated substantially under one management ever since. In the first instance, the Memphis & Charleston Railroad was let by lease to the East Tennessee, Virginia & Georgia Company, the rent agreed on being the net income of the former road above expenses. In a suit instituted for the purpose of testing the legality of that lease, it was set aside as being *ultra vires*. Another suit between the Knoxville & Ohio Railroad Company and the East Tenn., Va. & Ga. Company, to which the Memphis & Charleston Company was not a party, resulted in the acquisition by the East Tenn., Va. & Ga. Company of a large volume, nearly one-half, of the shares of stock in the Memphis & Charleston R. R. Company. Later acquisitions placed a majority—a bare majority—of the entire stock of the latter company, in the name and asserted ownership of the East Tenn., Va. & Ga. Company.

The bill insinuates that each of the two suits named above was collusive, at least in part, and facts averred point in that direction. It is also averred that certain shares of the stock, which were held by the Memphis & Charleston Company in its own right, were transferred by the common president of the two companies to the East Tenn., Va. & Ga. Company without any authority therefor. Marked bias and partiality in favor of the latter company are charged to have prevailed in these transactions, and it is also charged that the East Tenn., Va. & Ga. Company was without the power to acquire and own stock in another railroad company. It is expressly charged, that the intent and purpose of the said purchase of stock was to give to the E. Tenn., Va. & Ga. Company a controlling vote in the management of the Memphis & Charleston Company; and the exhibit taken from the record of the suit with the Knoxville & Ohio R. R. Company, if correctly set forth, proves this charge to be true. The bill further charges that, after the agreement of lease, noted above, which was in 1877, the two railroads have been operated under one and the same president, and under one and the same management. Inequality and fraud are charged in the combined management of the two roads, greatly to the profit of the East Tenn., Va. & Ga. Company, and to the equal detriment of the Memphis & Charleston Company.

The bill makes specific charges of partiality and maladministration, as follows: *First*, When the East Tenn., Va. & Ga. Company acquired controlling power over the Memphis & Charleston Railroad, the repair shops of the latter had been partially destroyed, but could have been rebuilt at a small expenditure. They were not rebuilt. The rolling-stock of the M. & C. Company was carried to the shops of the E. T., Va. & Ga. Company at Knoxville, Tennessee, "where the repairing was done at extravagant prices, and mileage was charged for all the distance the rolling-stock was carried over the road of the E. T., Va. & Ga. R. R. Company." *Second*, "The rolling-stock (of the M. & C. Company) was unnecessarily increased at exorbitant cost"— ($500,000 at one time)—"and was used by the E. T., Va. & Ga. R. R. Company upon its own road, without any compensation" to the M. & C. R. R. Company for such use. *Third*, "The M. & C. R. R. was renewed with steel rails, iron bridges and ballast, in advance of the needs of the railroad, to keep down the apparent net earnings." *Fourth*, "Less than the *pro rata* mileage share of through passenger and freight receipts from passengers and goods passing over both roads, was allowed to the M. & C. R. R. Company." The bill then proceeds to show, by tabulated statement and otherwise, that the percentage of net earnings, compared with the gross income of the M. & C. Company, was much less than that of the E. T., Va. & Ga. Company, while the former was more favorably circumstanced for cheap operation than the latter.

The bill charges that, at the election of officers of the M. & C. Company, held in November, 1886, the E. T., Va. & Ga. Company succeeded in electing seven of its own directors, to be directors of the M. & C. Company.—seven being a majority of the board. The directors then elected Thomas to be president of their board, he being at the same time president of the board of directors of the E. T., Va. & Ga. Company. The two railroads were thus placed substantially under one and the same government.

As we have said, the bill in this case was filed on the 27th day of October, 1887, and it charges that another election of directors would be held on the 17th day of November then next ensuing—twenty-one days after the filing of the bill. It charges further, that "if said E. T., Va. & Ga. Company, its directors, or any person on its behalf, shall be permitted to participate, or take any part in said election, or any

meeting of the stockholders of the M. & C. R. R. Company, the baneful control of the E. T., Va. & Ga. Company over its affairs will be continued for another year, and its legitimate earnings will be diverted from its stockholders, and under various devices absorbed by the E. T., Va. & Ga. Company." The prayer for injunction is two-fold: *First*, that the E. T., Va. & Ga. Company be enjoined from voting the stock standing in its name, either in the election of directors of the M. & C. Company, or in any other meeting of the stockholders; and, *second*, that it be enjoined from disposing of its stock, except with the knowledge and approval of the Chancery Court.

The reason urged in favor of the second of the above prayers is, that without such restraining order the stock might, and probably would, be transferred to some other name, and still held, and its voting power exercised, in the interest of the E. T., Va. & Ga. Company. Under some re-organization, the present corporate name of the latter company is, the East Tennessee, Virginia & Georgia Railway Company.

Under the statutes of this State, a general power is conferred to consolidate two or more railroads, which, when completed, "may admit the passage of burden or passenger cars over any two or more of such roads continuously without break or interruption."—Code, § 1583. A railroad corporation "may, at any time, by means of subscription to the capital stock of any other corporation or company, or otherwise, aid such corporation or company in the construction of its railroad, for the purpose of forming a connection with the road owned by such corporation or company furnishing aid; or any railroad corporation organized in pursuance of law may lease or purchase any part or all of any railroad constructed by any other corporation or company, if the lines of such roads are continuous, or connected."—*Ib.* § 1586. "A corporation now existing, or which may hereafter be organized, for the building, constructing and operating a railroad, has authority, for the purpose of extending its line, or forming a connection, to acquire, hold and operate a railroad without the State; or, within the State, may extend its road, or may build, construct and operate branch roads from any point or points on its line."—*Ib.* § 1587.

It is not contended that any of these sections, or all of them combined, confer in terms the powers which the bill alleges that E. T., Va. & Ga. Company claims and exercises in the management and control of the M. & C. Company.

The conduct charged and complained of was not the consolidation of two or more roads, for consolidation was neither effected nor attempted. Nor were any of the steps taken which the statute prescribes as conditions precedent to lawful consolidation. Nor was it the connecting of two roads, over which cars could pass "continuously without break or interruption." It was not giving aid by one corporation to another, "in the construction of its railroad, for the purpose of forming a connection with" it. Neither the *aid* nor the *purpose* existed in this case, if the averments of the bill be true. It was not a lease or purchase of the M. & C. railroad, or any part of it; and if such lease, or purchase, or other arrangement had been attempted, the lines of the two roads are not connected. And the averments of the bill negative the idea that any of these arrangements, connected operation, or consolidation, if claimed to be such, were agreed to, or consummated by the corporations, acting as such. Nor was there any agreement, or attempted arrangement, either express or implied, that the one railroad should acquire, hold and operate the other; nor is the M. & C. railroad, in any sense, a branch road, from any point on the line of the E. T., Va. & Ga. Company. It is not a branch road, according to the averments of the bill.

We repeat, the sections of the Code we have been commenting on do not expressly confer the powers which the complainants complain of as abuses, nor does the E. T., Va. & Ga. Company contend that they do. It could not so contend. Its precise contention is, that those statutes "evidence a settled policy of the State to encourage consolidations or combinations of connecting lines."

It is manifestly true that long connecting lines of railroad are a benefaction. They economize time and labor, and thereby lessen expense. Common observation, and the simplest processes of reasoning, show this to be too clear to require argument in support of it. But does the conduct complained of in this case encourage or promote the consolidation of connecting lines? Is it a legitimate means of accomplishing that end?

Private corporations can exercise only such powers as are conferred upon them, and such as are necessary and proper to carry the granted powers into effect. In this, however, is included the inherent, incidental power of doing and performing such acts as are necessarily implied in the line of trade or business of the corporation, as shown by the char-

ter, or law of its creation.— *Wilks v. Ga. Pac. Railway Co.*, 79 Ala. 180; 3 Brick. Dig. 159. Based on this princple, it is contended for appellee, that the E. T., Va. & Ga. Company had no power to acquire and hold shares of stock in the M. & C. Company; that its purchase of the stock was *ultra vires* and void, and that, as a consequence, it should not be allowed to exercise the powers, which rightful ownership alone confers; in other words, that to authorize the exercise of the privileges of a stockholder, the stock must have been lawfully acquired. On this ground it is contended, that the ruling of the chancellor in continuing the injunction is free from error. May it not be answered to this contention, *first*, that conceding the purchase of the stock by the E. T., Va. & Ga. Company to have been *ultra vires*, are the complainants in this suit in any position to raise that question? They are not stockholders in the E. T., Va. & Ga. Company, and can they be heard to complain that a corporation to which they are strangers has misapplied its funds? *Second*, does not the bill show on its face that the E. T., Va. & Ga. Company purchased the stock, not as an investment of its funds, but in the collection of a debt, due to it from another railroad corporation? The power of a corporation to acquire property, real and personal, as a means of collecting a debt, otherwise doubtful, stands on a very different principle from that which determines its power to purchase such property, as an investment of its funds or capital.—*First Nat. Bank v. Nat. Exch. Bank*, 92 U. S. 122; 1 Morawetz Corp. § 431.

We come, then, to the naked inquiry, can one corporation acquire a majority of the stock of another corporation, and, by the exercise of the voting power the majority of stock confers, govern and control the management of such corporation? This question, in its naked form, has rarely been presented to the courts, although it is generally known that such transactions are not infrequent.

In 1 Morawetz Corp., § 431, it is said: "The right of a corporation to invest in the shares of another company can not be implied merely because both companies are engaged in a similar kind of business. A corporation must carry on its business by its own agents, and not through the agency of another corporation." And this doctrine is stated, without dissent, in 4 Amer. & Eng. Encyc. of Law, 249, note 2. In *Central R. R. Co. v. Collins*, 40 Ga. 582, will be found a very full, and somewhat pioneer discussion, of the power and right of a railroad company to acquire and hold a

[Memphis & Charleston Railroad Co. v. Woods.]

majority of the stock of another railroad corporation, with a view of controlling its management. It is an able discussion, and although not presented precisely in the form in which the present bill raises it, it enunciates principles which bear on the question in hand. Among many other wise and conservative principles declared in that opinion, we transcribe and approve the following:

"I am strongly impressed with the conviction, that much of their [the railroads'] success in developing the resources of a country is due to the very jealousy which has ever held them strictly to their charters, and has constantly been careful to prevent any undue accumulation of interest under one management. The certainty that each stockholder has that his funds will be applied to known and declared purposes, has made them favorite investments for prudent men; whilst the rivalry which opposing interests engender, begets an energy, economy, skill and enterprise, that have had much to do with the remarkable progress which such enterprises have made. A colossal enterprise, assured of handsome dividends by the possession of a monopoly, may well rest upon its position, knowing that however the country may suffer from its exactions, its own profits are secure. It is the rivalry of opposing interests, the struggle for success, nay, even for life, with dangerous opposition, that gives life, enterprise and success to railroads, as to other human undertakings. It has been the conflict with thirty States' lines, each with its opposing interests, and with numerous seaboard cities, each seeking to attract the rich outpourings from the great interior, that has begotten the mighty network of iron, which interlaces our extensive territory; and I am convinced that there is no public policy more striking than that which, whilst it fosters every undertaking, is yet careful ever to keep in view the danger of a monopoly, and the good effects of rivalry and conflict between different companies. The Central Railroad is, and has long been, the pride of Georgia. The skill, energy and prudence, with which its affairs have been managed, reflect great credit upon the men who have had these affairs in their control, and the State may well be grateful for the success that has followed. Yet, we can not but think it would be a measure fraught with great public evil to give to that company permission to control and manage its great rival, the Atlantic & Gulf Road."

In the case of *Hazelhurst v. Sav. G. & N. Ala. R. R. Co.*, 43 Ga. 13, the principles of the foregoing case are re-affirmed.

[Memphis & Charleston Railroad Co. v. Woods.]

The case of *Milbank et al v. N. Y., L. E. & W. R. R. Co.*, 64 How. Pr. 20, was like the present one in most of its bearings. In that case, as in this, one railroad corporation had purchased a majority of the capital stock of another, and proposed to vote the stock so purchased in the election of directors. Certain stockholders in the latter company, owning a small minority of its capital stock, filed a bill to enjoin the purchasing company from voting the stock it had acquired, being a majority of the shares. The court, in delivering its opinion, said: "In the case under consideration, the New York, Lake Erie & Western Company have acquired by purchase the majority of all the stock issued by the Buffalo, New York & Erie Railroad. If its officers are permitted to vote thereon, they can elect a board of directors of their own choosing. It would then be for the interest of the New York, Lake Erie & Western Railroad Company to have the Buffalo, New York & Erie Company managed and controlled in the interest of the former company. This would be liable to result in injury to these plaintiffs and their fellow stockholders, and if so they have a right to complain. My conclusions, therefore, are, that while the New York, Lake Erie & Western Railroad Company is the owner of the stock in question, and has the right, while it remains the owner, to collect and receive the dividends thereon, and has the right to sell and dispose of the same, it has not the right to vote thereon; and that the stockholders of the Buffalo, New York & Erie Railroad Company have the right to have it enjoined from so voting, in case it threatened to do so. Judgment should be ordered for the plaintiffs, in accordance with the views herein expressed, with costs."

It is true that this was not a decision by the court of last resort. It was by the Supreme Court, an intemediate court in that State. It appears to have been acquiesced in, for no appeal is shown to have been taken. See, also, *Franklin Co. v. Lewiston*, 68 Me. 43; *Sumner v. Marcy*, 3 Woodb. & M. 105; *Mut. Sav. Bank v. Meriden Agency Co.*, 24 Conn. 159.

Corporations aggregate are governed, and must be governed and made efficient, through the instrumentality of agents. These agents, in cases of pecuniary corporations, are called directors, who are elected at stated intervals by the stockholders, for such term as the charter or regulations may prescribe. They may not be trustees in the technical sense, but their functions are largely and essentially fiduciary. *Hoyle v. P. M. R. R. Co.*, 54 N. Y. 328. Says Mr. Morawetz,

1 Corp. § 517, the directors "impliedly undertake to give the company the benefit of their best care and judgment, and to use the powers conferred upon them solely in the interest of the corporation. They have no right, under any circumstances, to use their official positions for their own benefit, or the benefit of any one except the corporation itself. It is for this reason that the directors have no authority to represent the corporation in any transaction in which they are personally interested, in obtaining an advantage at the expense of the company. The corporation would not have the benefit of their disinterested judgment under these circumstances, as self-interest would prompt them to prefer their own advantage to that of the company." A director "falls within the great rule by which equity requires that confidence shall not be abused by the party in whom it is reposed, and which it enforces by imposing a disability, either partial or complete, upon the party intrusted, to deal on his own behalf in respect to any matter involved in such confidence."—*Hoyle v. P. & M. R. R. Co., supra*, and authorities cited. So, in 1 Morawetz Corp. § 528, is this language: "A person who is agent for two parties can not, in the absence of express authority from each, represent them both in a transaction in which they have contrary interests. . . . It follows, therefore, that the directors, or other agents of a corporation, have no implied authority to bind the company by making a contract with another corporation, which they also represent." § 529: "It is well settled that, if the same persons are appointed to act as directors of different companies, they have no authority to represent both companies in transactions in which their interests are opposed. It matters not that the acts of the directors are in the interest of a majority of the shareholders in each company, and have received their approval. Nothing can be more unjustifiable and dishonorable than an attempt, on the part of those holding a majority of the shares in a corporation, to place their nominees in control of a company, and then to use their control for the purpose of obtaining advantage to themselves at the expense of the minority; it would be a conspiracy to commit a breach of trust. The directors of a corporation are bound to administer its affairs with strict impartiality, in the interest of all the shareholders alike; and the inability of the minority to protect themselves against unauthorized acts performed with the connivance of the majority, renders their right to the protection

41

of the courts the clearer."—*State, ex rel. v. Concord R. R. Co.*, 13 Amer. & Eng. R. R. Cases, 94; *Pearson v. Same, Ib.;* 102 Wall. 178; 1 Mor. Corp. § 530, and n. 3; Cook on Stock & Stockholders, §§ 618, 615.

Although, as we have said, directors of a pecuniary corporation may not be trustees in the technical sense of that term, they are under the same restraints, and labor under the same disabilities, which rest on trustees proper, so far as questions raised by the present bill are concerned. When personal interest antagonizes the disinterestedness and impartiality which the law, as well as morality, exacts in the exercise of fiduciary trusts, this is, *per se,* a disqualification, not by reason of any abuse committed, but in fear that weak human nature will yield to temptation. Justice Field, speaking of the conflict between duty and · interest, says: "Constituted as humanity is, in the majority of cases duty would be overborne in the struggle."—*Marsh v. Whitmore,* 21 Wall. 178; *Nathan v. Tompkins,* 82 Ala. 437; *Gr. Luxemburg Railway Co. v. Magnay,* 25 Beavan, 586.

The averments of the bill in this case show great wrongs done to the M. & C. Company by reason of the control exercised in its management by the E. T., Va. & Ga. Company. It also charges that it is the intention of the latter company to so vote its stock, as to maintain its control of the M. & C. railroad. Whether the charges of past abuses be true or false, they bring prominently to the notice of the court the character and extent of wrong and oppression, which one corporation may inflict on another, when circumstanced as these are.

It is scarcely necessary that we should specify in what manner the oppression may be inflicted. The board of directors elected by and for the E. T., Va. & Ga. Company, we must suppose, owe their election to all the stockholders, representing all the stock in that company. The duties of fidelity and impartialty in administering the affairs of that company, implied in the relation they sustain to it, we have stated above. They require severe disinterestedness as between the several shareholders, and unbiased fidelity to the prosperity and success of the corporation. Now, when the directors of the Memphis & Charleston Company, or a controlling majority of them, owe their election to the E. T., Va. & Ga. Company, and to that company alone, it is manifest that questions may and will arise, on which there will be a conflict of interest between the two companies. It

OF ALABAMA.

643

[Memphis & Charleston Railroad Co. v. Woods.]

is but human nature that, in such conflict, directors thus chosen will give their votes and influence in favor of the company they represent in full, and in whose entire income and emoluments they participate, rather than to the company they represent only to the extent of a trifle above a moiety of its stock; an integer against a fraction. Both law and reason force the implication, that in the governing body of a corporation duty and interest shall not point in opposite directions.

We hold that it is equally against public policy, and against that sound rule which disables trustees, or *quasi*-trustees, to act when their duty and interest conflict, that the E. T., Va. & Ga. Company should be allowed to vote its majority stock, in matters pertaining to the management and control of the M. & C. Company.

We confine our ruling, however, for the present, to cases like this one, where a conflict of interest may arise, in the matter of expenditures and their apportionment, in the division of patronage, or of earnings, and to rivalships between different companies having substantially the same field of operation, or where the profits of one enterprise will naturally be enhanced by the diminution of those of the other. There may be other cases to which the rule will apply, but we decline to consider them now.

This case has been very ably argued, and we are not unmindful of the grave consequences that may, and probably will ensue from our decision, not alone to the E. T., Va. & Ga. Company, but to many other corporations similarly circumstanced. We have not declared that the law does not authorize that company to acquire and hold stock, or shares of stock in another railroad corporation. Its charter not being before us, we have no means of ascertaining what its corporate powers are, further than the implications which naturally arise from its name and its lines of business inform us. We have not declared that, if the E. T., Va. & Ga. Company is without power to acquire and hold shares of stock in another railroad corporation, the complainants in this suit have shown any right to controvert the question of its rightful ownership. Hence, we have not decided that the Knoxville & Ohio Railroad Company was not the rightful, lawful owner of the stock which the E. T., Va. & Ga. Company acquired from it, nor that the latter company did not acquire a good title by its purchase. We have not attempted to set aside, or to declare invalid, either of these sales. We do not con-

trovert the general inherent right, resulting from the ownership of stock in a corporation, to exercise the elective power such ownership confers, and to exercise it wisely or unwisely, alone, or pursuant to an agreement with other stockholders; and that no one, save the former owner, can question the right to vote such stock, even when obtained by fraud, or other illegal means.—*Moses v. Scott*, 84 Ala. 608. This, we repeat, is the general rule; and less than this, in an ordinary case, would be an unauthorized abridgement of the stockholder's property-rights.

Enjoyment and the right of disposition are general attributes of property-ownership. Property-rights, however, can not be classed as absolutely independent of social and municipal regulation. "So use your own as not to invade the equal rights of others," is a maxim as sound in law as it is in the circle of social intercourse. Its observation and preservation are the end and aim of much wise legislation, of much judicial administration. But men must be dealt with, not as faultless, but as frail, and subject to temptation, too strong for their powers of resistance. Civil liberty is but natural liberty, shorn of its power to transgress the boundary which separates *meum* and *tuum*, in its comprehensive sense. Hence it is that the law, with inflexible purpose, has placed restraints on transactions in which duty and interest conflict. Hence it is that, when any relation of trust or confidence subsists, the law scrutinizes with earnest, if not severe vigilance, any pecuniary transaction that may be had between parties thus circumstanced. Hence it is, that when one man stands in a fiduciary relation to another, any contract, or bargain and sale, had with the beneficiary, is invalid at the mere option of the latter, if seasonably expressed. The danger of abuse in such conditions dominates the power of disposition; and the power to make binding contracts, which we have classed as among the general attributes of property-ownership, must submit to reasonable restraints.—*Thompson v. Lee*, 31 Ala. 292; *Moses v. Micou*, 79 Ala. 564; *Huguenin v. Basely*, 14 Ves. 273.

It is contended for appellants, that if a majority of the capital stock of the M. & C. Company had belonged to an individual, or to a combination of individuals, instead of being the property of the E. T., V. & Ga. Company, the same power of control could have been exerted, as is complained of in this cause. It is possible that there might be an exceptional, extreme case, in which it would advance the inter-

est of the owner or owners of a majority of the stock in a corporation to diminish its income, that the emoluments of another enterprise, in which he or they are more largely interested, may be thereby enhanced. Such case, however, is extremely improbable; and if found to exist, it might possibly present a case of wrong, for which injunction could furnish no preventive relief. This is a question we need not decide. As a rule, stockholders, in voting, as in other acts they are called to perform, attempt to promote the welfare of the corporation; for on its success depend their profits. Whether they act wisely or not, no one can be heard to complain of their conduct; for the success of the enterprise and their individual interests are presumed to be identical. In ordinary elections by stockholders, the presumption is, that men will act as their interests prompt them to act, and that their aim is to benefit the corporation in which they are stockholders. Should a case arise in which there is bad faith in the management, and consequent loss to the stockholders, there would seem to be no doubt that redress could be obtained from the faithless governing body.

The case in which the votes are cast by individual stockholders, and the one in hand, are, presumptively at least, essentially different. In that, duty and interest are in complete accord. In this, if the averments of the bill be true, they are in palpable antagonism. In the one, the presumption is that the vote will be cast solely in the interest of the corporation holding the election. In the other, that the greater opposing interest will prevail over the lesser, as it is so apt to do in all human conduct. We think it is no answer to the relief prayed in this case, that in another possible, supposable case, a wrong very like the one here complained of might be inflicted, and yet the same measure of redress could not be accorded.

It is contended that, if relief be granted in this case, it will greatly embarrass railroad corporations, in the matter of maintaining continuous, connecting lines, so conducive to public convenience, and to economy in transportation.

It can not be denied that steam has, in many respects, revolutionized the world, and that railroads are among the more potent instrumentalities which have effected that revolution. The nations of the earth have been brought into closer neighborhood and better acquaintance, while Christian civilization has been much more speedily and widely diffused. So, commerce and the industrial enterprises have

received a new impetus and expansion, theretofore unknown in the world's history. An instrumentality possessing such vast capabilities should be cherished and protected in the enjoyment and exercise of all its rights and privileges. The groveling or agrarian spirit which would hinder or embarrass this mighty agency in the full enjoyment of its rightful powers, should receive no encouragement or countenance from right-thinking .people. On the other hand, the tremendous power that may be wielded by aggregated or incorporated wealth should be kept within due bounds, and restricted to legitimate methods. The pernicious ends to which concentrated wealth may be perverted, need not be mentioned here. The virtuous and patriotic utterances of many of the courts of supreme jurisdiction, re-echoed from the highest officials in the Federal Government, show all too plainly that the public is awakened to the wrongs inflicted through the instrumentality of combined capital. Let us accord to corporations all their rights, and restrain them in the abuse of their powers, should such be attempted.

The principle we have declared in a former part of this opinion will apply with equal force to all employees, agents, and all other persons or corporations, who may be acting in the interest, or for the benefit of the E. T., Va. & Ga. Company. Nothing less than an absolute sale of the stock to some person or persons authorized to vote it, will relieve it of the infirmity of its present ownership, or authorize the present, or any pretended owner, to be heard in the government of the M. & C. Company.

The bill does not charge that the E. T., Va. & Ga. Company contemplates a sale, or pretended sale of the stock, and does not charge that the company, by any indirect means, will attempt to have its stock voted in its interest. The charge is, that "if said E. T., Va. & Ga. Company is permitted to transfer said stock, it will conceal its interest in the same under the name of some other party, and through such party re-acquire the control it now has with said stock standing in its own name." If such attempt be made, without an actual sale of the stock, it will be a violation of the order made in this case, and can be punished as such. Moreover, an election of directors thus procured would be a fraud perpetrated in defiance of the order of the court, and such election would be annulled on proper application. We hold, however, that in the present stage of this case, and under the averments of the bill, all of which that is pertinent we

have copied, there is not enough shown to authorize an injunction against a sale of the stock. That question can be properly raised, when an attempt is made, should it ever be made, to violate or evade the principles of the injunction granted in this cause.—1 Brick. Dig. 704, § 930; 3 Ib. 377, §§ 154, 155, 158.

The bill in this case avers, that before filing the bill the complainants "requested the Memphis & Charleston Railroad Company, by a request addressed to its officers, to take appropriate legal proceedings to prevent the stock standing in the name of the East Tennessee, Virginia & Georgia Railway Company from being voted upon," &c., "but said corporation has neglected to comply with said request." This averment is sufficient to authorize the stockholders to sue in their own names, if any previous request was necessary to give them that right. Circumstanced, as this case is charged to have been, it would seem any previous request would obviously have been denied, and therefore it was not necessary to prefor it.—*Tuskaloosa Man. Co. v. Cox*, 68 Ala. 71; *Nathan v. Tompkins*, 82 Ala. 437; *Merchant & Planters' Line v. Waganer*, 71 Ala. 581; Green's Brice's *Ultra Vires*, 673, note *a;* *Dodge v. Woolsey*, 18 How. U. S. 331; *Hawes v. Oakland*, 104 U. S. 450.

We have stated above, that the complainants' bill makes a case for an injunction, restraining the East Tenn., Virginia & Georgia Railway Company, its agents, directors, and all other persons representing it and its interest, from voting the shares of stock held by that company. We have forborne to state one imperfection in the bill, until this time. Many of the essential averments of the bill are stated in this form: Complainants are "informed and believe," or, are "advised and believe," without any allegation or charge that the information or advice is true. This form of allegation has always been held, in this court, to be insufficient. It is not an averment that the information or advice is true, but that the pleader believes it to be true. A full denial of such averment would be, either that complainants had not received such information or advice, or, if they received it, they did not believe it. This would not present the issue sought to be raised.—1 Brick. Dig. 702, §§ 907-908. We will not, however, dissolve the injunction for this imperfection in pleading. Should it not be remedied within a reasonable time, it will become the duty of the chancellor to act upon the bill as if the imperfect averments pointed out had not been made.

[Jaffrey & Co. v. McGough.]

The decree of the chancellor is modified, and the cause remanded. Let the appellees pay the cost of appeal.

Modified and remanded.

McClellan, J., dissenting.