Kinkead, J'.
The submission is upon a motion by tbe defendant to dissolve, in part, tbe temporary restraining order allowed upon tbe filing of the petition.
Much evidence in the form of affidavits was offered on both sides and tbe questions have been argued at great length, orally and upon brief.'
Because of the magnitude of the questions and interests involved, all other work in and out of court having been laid aside, *643 the consideration having been continuous and uninterrupted.
The plaintiffs institute this action as stockholders. They- aver that:
“Each of ■ them are stockholders of the- defendant. Said Howard D. Manington is the owner and holder of common stock of said defendant, -and each of the other plaintiffs, Fred H. Schoedinger and Ralph E. Westfall, are the owners and holders of shares of both common and preferred stock of said defendant, and they bring this action on their own behalf and on behalf of all other stockholders of said defendant, the Hocking Valley Railway Company.”
The quotation from the petition is thus stated because of the importance of the question as to the capacity in which the plaintiffs stand in this action, hereafter to be discussed.
The petition contains a lengthy recital of the history pertaining to the defendant since its reorganization under plan of J. P. Morgan & Company, of New York City, on the 25th day of February, 1899, down to the judgment of the Circuit Court of Franklin County, Ohio, rendered on the 18th day of January, 1910, wherein it was decreed that the ownership by the defendant company of the stock in the Sunday Creek Coal Company, the Sunday Creek Company, the Continental Coal Company, the Buckeye Coal & Railway Company, and perhaps some other interests, was illegal; that the contracts of the defendant with the Continental Coal Company -and the Toledo & Ohio Central Railway Company for an equal division of coal shipments and the guaranty of bonds were illegal; that the combination of the defendant with the T. & O. C. Railway was illegal; that ownership by defendant of the stock of the Kanawha & Michigan Railway Company and of the T. & O. C. Railway was illegal.
' All of these matters -are familiar history and are found in the report of decision in State, ex rel, v. Hocking Valley Railway Company, 12 C.C.(N.S.), 49 and 145, and in a report of the investigation by the Interstate Commerce Commission into the subject of railroad discriminations and monopolies in coal -and oil and particularly as to the part taken therein by the Hocking Valley Railway Company, and also in a report of the Attorney- *644 General to the Ohio Legislature, pursuant to House resolution number six. These past transactions which need not' be recited in this opinion, were evidently set forth in the present action for the purpose of showing the condition or status of the defendant so far as its assets' were concerned, to throw light on the acts and transactions of the defendant and others now complained of.
The assets which the defendant had accumulated and brought together under the previous illegal combination, consisting of interests in various coal companies and in the two railroad companies, the Kanawha & Michigan and the Toledo & Ohio Central, having been held by the circuit court to have been illegally in its possession, the corporation was therefore confronted with the problem of compliance with the judgment of that court and of how to divest itself of the ownership of these properties.
The remaining portion of the allegations contained in the petition from page 31 to 39 may be summarized in the following manner:
1. The management and control of the road by other railroad companies (in the past) has been through dummy directors under the dictation of the Trunk Line Syndicate.
2. That it has engaged in conspiracies against trade and to stifle competition.
3. That it has discouraged and throttled the development of the coal mining industry in the Hocking Valley district.
4. That it has extended unfair privileges and has discriminated in favor of coal companies.
5. That it has failed to collect freight bills of the Sunday Creek Company to the extent of two million dollars.
6. That it has refused to permit stockholders to examine its books.
7. That the policy of discrimination has been to foster monopoly.
8. That it has precipitated needless and expensive litigation.
9. That it has jeopardized its charter rights by its unlawful course of conduct.
*645 10. Complaint is also made that it is jeopardizing and endangering its charter rights by its present course of conduct or its conduct subsequent to the decree of the circuit court. •
11. That the directors are or have been surreptitiously disposing of large and valuable assets, in an unfair, illegal manner, without exercising diligence to obtain the highest and best prices for such property.
12. That the defendant has managed the business of the Kanawha & Michigan Railway Company, thereby subjecting itself to numerous lawsuits, and danger of loss on account thereof.
13. That large amounts of assets have been diverted and misappropriated.
14. That the directors and officers of the defendant, in the past, have made large personal gains in the management thereof.
15. That the directors and officers have caused the defendant to become an active member of an illegal combination or trust; that it is now a member of a trust commonly known and designated as the Coal Traffic Association.
16. The claim is also made, especially it was sought to be established by the affidavits offered, that the defendant is still a member of the Trunk Line Syndicate, which it is charged is still continuing, and that the defendant is committed to it or will be in the hands of the Chesapeake & Ohio Railway Company.
The Chesapeake & Ohio Railway Company—Its Holding op a Majority op the Stock op the Dependant, etc.
The principal complaint made in the petition, and the one most considered in argument, is the charge that the Chesapeake & Ohio Railway Company was a member of the Trunk Line Syndicate, of which the Hocking Valley was a member prior to the decree of the circuit court. The petition charges, in substance, that for the purpose of evading the decree of the Franklin County Circuit Court, and for the purpose of continuing the illegal and unlawful combinations and trusts prohibited by that decree, in pursuance of a conspiracy with the Chesapeake & Ohio Railway Company, and with members of the said Trunk Line Syndicate, that about March 22d, 1910, a pretended trans *646 fer of the common stock 'of the defendant was made to the Chesapeake & Ohio Railway, and that in pursuance of said conspiracy the defendant made a pretended transfer of its interest in the capital stock of the Toledo & Ohio Central and the Lake Shore road, another member of said Trunk Line Syndicate, and to the Lake Shore and Chesapeake & Ohio jointly, the defendant’s interest in the stock of the Kanawha & Michigan and Zanesville & Western Railway Companies.
The charge is also made that the old directors of the defendant company resigned, and that in their place was elected Edwin Iiawley, Frank Trumbull, George W. Stevens, A. C. Rearick and dames S. Mackie, all of whom were and are now directors of the Chesapeake & Ohio Railway Company.
It is then averred that it is'necessary for the defendant to retire its preferred stock of fifteen millions for the purpose of carrying out the proposed' scheme and conspiracy to give the •Chesapeake & Ohio Railway Company the control and management of the Hocking Talley; that, as the preferred stock has equal voting power with the common stock in the management of the affairs of the company and in the election of its directors, upon its retirement the Chesapeake & Ohio Railway Company, having a majority of the common stock, will then be in complete control of the defendant. It is then charged, in substance, that the directors of .the defendant, the majority' of whom are directors of the Chesapeake & Ohio Railway Company, are pror eeeding to retire the fifteen millions of the preferred stock of the defendant, the object and purpose of which is to secure and fasten control of the defendant in the hands of the 'Chesapeake & Ohio Railway Company; that the same is being done by the directors of the defendant in pursuance of the conspiracy of the Trunk Line Syndicate which formerly existed and controlled the defendant and its' properties before the decree of the circuit court. The petition discloses the resignation of the old directors of the defendant and the selection of the new directors, who are concededly also officials ‘and directors of the Chesapeake & Ohio Railway Company.
*647 That the retirement of the fifteen millions of preferred stock is merely to enable the C. & O. Railway Company to control the defendant.
That the acquisition by the Chesapeake & Ohio of the majority of the stock of the defendant, .and its joint control in harmony with the Lake Shore & Michigan Southern of the Kanawha & Michigan Railway, eliminates and destroys all competition between the Kanawha & Michigan Railway Company, the Chesapeake & Ohio Railway Company, the Lake Shore & Michigan Railway Company, the Zanesville & Western Railway Company, and the Toledo & Ohio Central Railway Company and the defendant, the Hocking Yalley Railway Company.
There are certain other complaints made as to the joint control of the Chesapeake & Ohio Railway Company and the Lake Shore of the Kanawha & Michigan Railway Company, the charge being that such control amounts to a .virtual consolidation of all the roads above mentioned in the hands of the Chesapeake & Ohio Railway Company and the Lake Shore, which will destroy all competition in trade and commerce on said several lines.
It is charged that the defendant company has not sufficient funds on hand with which to retire the preferred stock.
That a special meeting- of stockholders is called for May 11th, 1910, at which an increase of the common stock of defendant will be made to the extent of fifteen millions, and that such proposed increase of the common stock is illegal;- that it is not for the purpose of providing funds for the construction of its road, or a second track, or to extend its line, or to construct branches, or to increase its machinery, or to pay off bonds, or for the purchase of .a railroad, etc.
That the increase of stock is for the purpose of carrying out the plans, schemes and conspiracy to enable the C. & O. Railway to more effectually and completely control the defendant.
It is then averred that the Chesapeake & Ohio Railway Company have called a meeting of its stockholders- to authorize an increase of its stock, -and the issuing of bonds, the notice of *648 which, meeting provides that such increase is for the purpose of providing funds for the acquisition of the majority of the common capital stock of the defendant company and of a substantial interest in the capital stock of the Kanawha & Michigan Railway Company.
There are many other allegations in the bill not necessary to be here enumerated. The prayer is for temporary and permanent relief by way of injunction:
1. To restrain the retirement of the preferred stock as contemplated, and the use of its property, assets or money for that purpose.
2. To restrain the increase of the common stock.
3. To prevent the holding of the meeting of the common stockholders on May 11th, 1910.
4. To restrain the stockholders- at such meeting from increasing the stock.
5. To restrain the defendant from in any manner recognizing the Chesapeake & Ohio Railway Company as a stockholder of the defendant, and to enjoin the defendant from permitting the said the Chesapeake & Ohio Railway Company, its officers, agents, directors or representatives, from voting any of the stock of the defendant company, owned or controlled directly dr indirectly by said Chesapeake & Ohio Railway Company.
6. To restrain the defendant from borrowing money for the purpose of retiring its preferred stock.
A brief review of some of the essential facts will now be made.
Disposition op Assets.
The proof shows that the assets of the defendant company, which consisted -of its -illegal holdings in various companies forbidden by the circuit court decree, were disposed of in the following manner:
Frank Trumbull, chairman of the board of directors'of the Hocking Valley Railway Company, and -also a member of the board -of directors and of the executive committee of the Chesapeake & Ohio Railway Company, acting on behalf of the Chesa *649 peake & Ohio Railway Company, and W. H. Newman, representing and acting on behalf of the Lake Shore & Michigan Southern Railway Company, entered into an agreement, whereby it was agreed in substance that the Chesapeake & Ohio Railway Company should purchase all the stock held and owned by various other railroads in the Hocking Valley, while the Lake Shore would purchase all the stock owned by the Hocking Valley in. the Toledo & Ohio Central Railway Company, which was held or owned through or by means of the Middle States Construction Company, a New Jersey corporation organized for the express purpose of enabling the Hocking Valley to own and control the T. & O. C. Railway Company.
Under this agreement the Chesapeake & Ohio Railway Company purchased of the common stock of the Hocking Valley the following: from the B. & O. Railway, 11,540 shares; from the Chesapeake & Ohio Railway, 11,540 shares; from the Erie Railroad, 11,540 shares; from the Láke Shore & Michigan Southern Railway, 11,540 shares; from the P., C., C. & St. L. Railway, 23,082 shares; total 69,242 shares. From the Hocking Valley, 380 shares; from other sources, 3 shares; making a total .of 69,625 shares.
This shows, therefore, the total holdings of the Chesapeake & Ohio Railway Company of the common stock of the Hocking Valley Railway Company to be 69,625 shares. It does not own any preferred stock, nor does it appear that any of the railroads heretofore constituting the Trunk Line Syndicate ever owned any of the preferred stock. It was stated in argument and rather seemed to be conceded by both sides that the fifteen millions preferred stock which is sought to be retired was the only stock that was held by people generally, and that' there were about twelve hundred persons who owned that stock.
It may be remarked in passing that the evidence offered discloses that this Trunk Line Syndicate consisted of the B. & O. Railroad Company, the C. & O. Railway Company, the Erie Railroad Company, the Lake Shore & Michigan Southern Railway Company, and the P., C., C. & St. L. Railway Company, copies of the minutes of such syndicate from March 9th, 1905, up to *650 some period of time, to be mentioned, of the year 1910, having been offered in evidence. It will be noticed too from the above tabulation that four of the roads had equal holdings in the common stock of the ITocking Valley Railway Company, while the Pan Handle road owned a considerable portion more than the other four.
It may also' be observed at this point of consideration of the facts in this case that these previous holdings of the Trunk Line Syndicate are significant in view of the admitted facts now before the court, that an agreement was made by the two members of such syndicate, namely, the Chesapeake & Ohio Railway Company and the Lake Shore & Michigan Southern Railway Company, for the re-adjustment of all of the stocks previously held by members of the Trunk Line Syndicate. In pursuance of the agreement between the representatives of the Chesapeake & Ohio Railway Company and of the Lake Shore & Michigan Southern Railway Company—Mr. Trumbull and Mr. Newman—■ the Lake Shore purchased from the Hocking Valley all of the bonded indebtedness of the Middle States Construction 'Company, carrying with it the stock of the Toledo & Ohio Central Railway Company, paying therefor $8,421,000. A special examination of the books of the defendant company by Hon. J. M. Sheets and C. O. Hunter, appointed by the court for that purpose, verifies the source of the money deposited by the defendant with J. P. Morgan & Company for the retirement of the bonds.
On the determination of the final merits of this controversy, it would be desirable of course to determine absolutely the source of these funds; that is, to settle conclusively whether or not the Chesapeake & Ohio Railway Company actually furnished rf-.Tn'g amount of money from its resources or whether it borrowed it or obtained any portion of it from other members of the Trunk Line Syndicate. A court in investigating such a matter desires to know positively these facts, and it must be conceded that' because of the previous manipulations of these properties .by this Trunk Line Syndicate, their acts now are under the ban of suspicion.
*651 It appears from, the evidence that the Hocking Yalley, by resolution of its directors, proposed that the company (first restoring to the Toledo & Ohio Central its original ownership in the 45,110 shares of-the capital stock of the Kanawha & Michigan), sell the Middle States Construction Company bonds for $8,421,000, and that it would accept a money consideration in lieu of the Zanesville & Western stock and bonds, leaving them still in the treasury of the Toledo & Ohio Central,, for $10,197,874.67, which netted the defendant the par of the bonds, namely, $8,421,000 and the actual original .cost to it of the Zanesville & Western, to-wit, $1,776,874,67. This is a copy of the statement appearing in the minutes of the board of directors of the defendant company.
The Lake Shore, as shown by the affidavit of Frank Trumbull, and comparing that affidavit with the minutes of the defendant, made this purchase for $10,197,874.67.
The affidavit of Frank Trumbull, further discloses that as a. part of the agreement made between the C. & O. Railway and the Lake Shore “that the Lake Shore should loan or cause to be loaned to the Sunday Creek Company * * * sums not exceeding $1,143,110.60, to be evidenced by notes.” The minutes of the defendant discloses that the purchaser of the above' securities, namely, the Middle States Construction Company and the Lake Shore, ‘ (had agreed to procure from other parties a loan to the Sunday Creek from time to time when and as needed by that company of the sum of $1,500,000, thus bettering the condition of this company as a creditor of the Sunday Creek Company.
The reason, object ánd purpose of this agreement calls for explanation.
It is proper to state in connection with the action of the defendant company in disposing of its assets to the Chesapeake & Ohio Railroad Company, as above stated, that the minutes of the meeting of the directors of the defendant company, held March 18th, 1910, at which time this sale and the terms and conditions on which it was to be made, show there were present of the board of directors Messrs. Axtell, Bush, Galloway, Gillard, *652 Huntington, Hoyt, Monsarrat, Underwood and Sheldon. The record of the minutes of that meeting contains this statement :
‘ ‘ The president declared the resolution adopted by the unanimous vote of the board. Mr. Axtell called the president’s attention to the fact that, as he was the representative of the Chesapeake & Ohio Railway Company, which was to be interested indirectly in the transaction, he had not voted at all for that reason.”
Cash Deposit with J. P. Morgan & Company for Retirement of Preferred Stock.
The following is taken from the books'of the defendant company:
Paid to J. P. Morgan & Company, as trustees for retirement of preferred stock of the Hocking Valley Railway Company, under an agreement with J. P. Morgan & Company, dated April 7th, 1910:
1910.
April 7th ..................$11,810,274.44
April 8th .................. 79,725.56
April 18th ................. 800.000.00
April 20th .................. 420,000.00
April 21st ...'.............. 2,895,241.71
Total.................... $15,285,241.71
Transferred by J. P. Morgan & Company to Hocking Valley Railway Company deposit account on account of excess of payment..... . 85,241.71
Balance .............. $15,200,000.00
The agreement upon which it is claimed by the- defendant that this money was deposited with J. P. Morgan & Company for the purpose mentioned consists of the following letter:
“New York, April 7th, 1910. “Messrs. J. P. Morgan & Company,
“New York City.
“Gentlemen: The undersigned, the Hocking Valley Railway Company has paid yon today, as trustee for the retirement of the preferred stock, and upon the terms hereinafter provided, $11,810,274.44. The retirement of the preferred stock, together *653 with accrued dividends up to April 30th, will require $15,200,-000.00. The company hereby agrees on or before the 30th of April to pay you in addition to the amount paid today, $3,389,-725.56, so as to make up the full amount necessary for such retirement on April 30th. It is understood that you are to have the use of the money as compensation for your services, the company agreeing on April 30th, to pay you in cash the difference between two per cent, interest on daily balances of money paid by you to the company, and $38,000.00. While the preferred stock is to be retired as of April 30th, if any holders of certificates present their certificates to you before that date and are willing to discount the dividends between the date of surrender and April 30th, you are authorized to immediately pay the holder par and accrued dividends to the date of surrender.
“This letter, when accepted by you, may ’be considered as a contract between the company and yourselves.
“We transmit herewith a certified copy of the minutes of the meeting of the board of directors, held in Columbus April. 1st 1910, showing the authority for making this contract with you.
“Yours very truly,
“The Hocking Valley Railway Company, “(Signed) By James IT. Hoyt,
Second Vice-President. “Attest: (Signed) Jas. Stuart Mackie, ,

Assistant Secretary.

April 10th, 1910.
“Accepted to the extent of the monies above mentioned as and when the same shall be received by us.
“(Signed) J. P. Morgan & Company,
“(Signed) Jas. Stuart Mackie,

“Assistant Sec’y. and Asst. Treas.”

The Directors.
Decatur Axtell is first vice-president and director of the C & O. Railway; also first vice-president and director of the Hocking Valley Railway Company. John Galvin is now a director of the Hocking Valley and local attorney at Cincinnati for the Chesapeake & Ohio Railway Company. Edwin Hawley is director of the Hocking Valley, of the Kanawha & Michigan Railway Company, of the Chesapeake & Ohio Railway Company, and quite a number of other companies, not, however, any of the Trunk Line Syndicate. James H. Hoyt is an officer and direc *654 tor of the Hocking Yalley and also general counsel of the Kanawha & Michigan Railway Company. A. C. Rearick is a ■ director of the Hocking Yalley as well as general attorney for the Chesapeake & Ohio Railway Company. George W. Stevens is president and a director of the Hocking Yalley Railway Company; also president and director of the Chesapeake & Ohio Railway Company. Frank Trumbull is chairman of the board and a director of the Hocking Yalley Railway Company; also chairman of the board and director of the Chesapeake & Ohio Railway Company; also director of the Kanawha & Michigan Railway Company, and a number of others, but not members of the Trunk Line Syndicate spoken of in this decision.
■ On March 22d, 1910, of the old directors of the defendant, the following tendered their resignations, which were accepted, to-wit: R. M. Galloway, Charles B. Alexander, F. D. Underwood, A. IT. Gillard and Nicholas Monsarrat. In their place there was elected Edwin Hawley, Frank Trumbull, George W. Stevens, A. C. Rearick and J.ames S. Mackie, all of whom are either directors, or officers, or bear some relation as attorney or otherwise to the Chesapeake & Ohio Railway Company. The board as now constituted contains a majority of directors who are officers of the Chesapeake & Ohio Railway Company. Or at least, with James IT. Hoyt, as general counsel for the Kanawha & Michigan, there is a majority of the directors who are acting in the interests of both the Chesapeake & Ohio Railway Company and the Hocking Yalley Railway Company in this proposed change.
Acts of the Defendant to Retire Preferred Stock.
On April 1st,' 1910, at a meeting of the board of directors of .the Hocking Yalley Railway Company, the following resolution was passed:
“Whereas, In the articles of incorporation and regulations of the company, it is provided (which provision is embodied in all of the certificates of the preferred stock of the company now outstanding, and therefore making a contract between teaid company and the holders of said preferred stock), that said preferred stock be retired at any time subsequent to three years after its issue by the company; and
*655 “Whereas, All of the preferred stock of the company has been issued more than three years prior to the date of this meeting, and it is desirable and the sense of the board that said preferred stock shall be retired in pursuance of the power reserved by this company; now, therefore,
“Be it Resolved, That said preferred stock be and hereby is retired as of April 30th, 1910, at par, together with the proportionate share of the dividend thereon from the date when the last dividend accrued, viz.: December 31st, 1909, to April 30th, 1910, at the rate of four per cent, per annum; and,
“Be it Further Resolved, that the proper officers of the company be and they are hereby instructed to notify the preferred stockholders of record that the preferred stock is hereby called for retirement by the company at the office of J. P. Morgan & Company, New York City, on April 30th, 1910, at par and accrued dividends to said date; and
“Be it Further Resolved, that from and after the date of said retirement, to-wit, April 30th, 1910, in the exercise of the power reserved by the Hocking Valley Railway Company and specifically declared in every stock certificate issued and outstanding, no holder of any certificate for preferred stock shall thereafter have any right as a stockholder nor any claim against the company except to receive payment for certificates surrendered at the rate above stated.”
At the time of the passage of this resolution the board of directors of the defendant corporation was in thecontrol of persons who are officers and members of the board of directors or attorneys for the Chesapeake & Ohio Railway Company. This fact is brought into this opinion because it has bearing upon the general purpose of those involved in seeking to make the change in the affairs of the Hocking Valley.
The foregoing statement of pleadings and the evidence is sufficient to form the foundation of a discussion of the legal questions involved, although some further facts may be discussed in connection with some of the questions.
The first question to be considered is:
Standing of the Plaintiffs as Stockholders in a Court of Equity, Seeking the Relief Asked for by Them.
The transfer boobs of the defendant company show that the plaintiff, Ralph E. Westfall, became the holder of record of one *656 hundred shares of the Hocking Valley preferred stock on August 1st, 1909.
That Howard D. Manington, on October 16th, 1909, became the holder of record of twenty-five shares of the Hocking Valley preferred stock.
That Fred H. Schoedinger became the holder of record of thirty shares of the Hocking Valley preferred stock on November 1st, 1909.
The transfer records also show that each one of the plaintiffs became the owner of common stock on the 9th day of April, 1910; Ralph E. Westfall becoming the owner at that time of forty shares of the common stock, Howard D. Manington becoming the owner of twenty shares of the common stock, Fred II. Schoedinger becoming the owner of thirty shares of common stock.
The position taken by counsel for the defendant is that the ownership of preferred stock by each of the plaintiffs, which was long prior to the chief acts herein complained of, does not give them any standing in court because they have no legal right to complain of the retirement of the preferred stock for the reason that it was a matter of contract between stockholders and the company that it should have the right at any time after three years to make this retirement. It is also urged by defendant’s counsel that none of the plaintiffs were owners of common stock at the time the directors decided to redeem its preferred stock; that it was only nine days after notice had been given of the action of the directors that each of the complainants acquired their common stock; and eighteen days after their acquirement of the stock this action was1 filed by them. It is also claimed that the acquiring of this common stock was for the express purpose of bringing this action; that as plaintiffs believed that they could not institute legal proceedings as preferred stockholders, they procured the common stock for this purpose.
It is claimed that the motives of the plaintiffs in the institution of this action are ulterior and that the conduct of two of them, being members of the bar, is unprofessional. On the other hand the counsel for the plaintiffs claim, that in respect to the preferred stockholders, and their rights, they having the *657 the same privilege to vote at stockholders’ meetings' as the holders of common stock, their rights are being infringed upon; because they claim that the preferred stock can not be retired excepting by consent of a majority of all stockholders, preferred and common. As to the holding of the common stock .it is the contention of the plaintiffs that they may properly stand upon their strict legal rights of ownership thereof, and that any motive which they may have or not have is not a proper subject of inquiry.
There is no showing made concerning the ownership excepting the bare facts thereof. From these it is urged that the peculiarly suggestive circumstances point clearly to-the conclusion that the actions of the complainants have been inspired by some motive quite ulterior to that which they profess in bringing the action.
In the extended and comprehensive discussion of the question, and the review of the authorities by the learned counsel in this case, the distinction has not been clearly drawn in respect to the two rules pertaining to suits brought by stockholders of corporations. This distineton is made, and it is well recognized, because the action by stockholders may be brought in different capacities depending upon the nature and character of the relief sought by them. For instance, a minority stockholder or ¿stockholders may institute an action wherein the relief sought is that which is for the general benefit of the corporation itself, and secondly for the benefit of all of the members and stockholders thereof. On the other hand one or more of the minority of stockholders may institute a suit in equity wherein the relief sought is for the protection of their individual property rights 'as owners of stock, and for the protection and preservation thereof. In such actions they may simply assert a strict legal right of property inherent in themselves as stockholders, and in such case they may properly stand upon those strict legal rights, and whatever their motives may be, they may nevertheless invoke the equitable powers of a court.
This distinction has been clearly recognized in law, and is supported and fortified by rules, to accomplish the purposes *658 and rights sought to be claimed in the different' capacities in which the stockholder may act in the particular action. These rules, as they have been discovered and drawn from the sources of the law, are these: If the relief sought in the action by the stockholder is of such nature and character that of necessity it must be sought on behalf of the corporate entity, and should have been brought in the first place by the corporation itself by its properly authorized officers, who have failed or refused on proper demand so to do, then such suit may be brought by the stockholders on behalf of the corporation, and recovery therein is for the general good or benefit of the corporation, and will inure to the mutual benefit of all the creditors and stockholderg thereof.
If, on the other hand, the relief sought in the action by the stockholder is primarily and inherently for the protection and preservation of the individual property right of the stockholder, then the relief through the remedial processes 'of the action will result in the specific accomplishment of the object or purpose thereof by preventing the threatened illegal act or acts of the corporation through and by means of the acts'of its officers’or agents thus protecting and preserving the legal rights of the stockholder and enabling him to enjoy his property-rights and the benefits thereof.
Illustrations of these two phases of the rights of individual stockholders in the maintenance of actions by them may be found in the petition itself in this case. For example, it is claimed by plaintiffs that the assets of the defendant have been wasted and lost by the acts of its officers; it is also claimed that certain of the officers and agents have reaped personal gains in the tranactions and manipulations of the business and affairs of the defendant in the various stock transactions. But it will be noticed that.the prayer of the petition does not seek a specific relief in that direction. It must therefore be concluded that the allegations are rather incidental than germane to the specific ultimate relief sought. If the final relief, for instance, was for the recoupment of the two million apparent loss by reason of the action of the defendant in failing to collect the *659 freight bills of the Sunday Creek Company, one of its creditors, or for the recovery of any of the losses sustained by reason of any alleged personal gains of the officers and directors, then the suit would be considered to have been brought by the plaintiffs in their representative capacity as stockholders.
But the gist of the complaint is the alleged unlawful retirement of the preferred stocky and the alleged illegal holdings of the common stock of the company by the Chesapeake & Ohio Railway Company, and a virtual control of the ITocking Valley by means of the holdings of the common stock by the Chesapeake & Ohio Railway Company, and to prevent this corporation from exercising the right of an owner of the- majority of the common stock of the defendant company, and from voting the ■same at the specially called meeting of the stockholders to be held, and to prevent the threatened alleged unlawful increase of the common stock of the defendant company.
These purposes clearly appear to be legitimate legal objects to be° sought by stockholders in an action by them for the protection and preservation of the strict legal rights of ownership.
The rules of law to be applied and which govern suits by stockholders in their representative capacity on behalf of and for the corporation is that they must "come into court with clean hands”; the .suit must be in good faith; it must be clear that it is for the benefit of the company.
"The principle upon which that construction is permitted, indispfitably requires that the suit shall be a bona fide -one, faithfully, truthfully, sincerely, directed to the benefit of the interests of those stockholders whom the plaintiff claims a right to represent.”
This "has been a very wholesome doctrine” upon which the legal right that one stockholder must have in view when he brings an action in his representative capacity. It was established as long ago as 1861 by the English Court of Appeals in Forrest v. Manchester, etc., Ry. Co., 4 De G. F. & J., 125, and has been continuously applied in American courts in like cases. The court there recognized, as all courts have since, that if such suits are found, after full hearing, to have been pursued with *660 improper motives, the same should be promptly dismissed. The authorities supporting this view are; Belmont v. Erie Ry. Co., 52 Barb., 662; Dimpfell v. O. & M. Ry., 110 U. S., 209; Kingman v. R. R. Co., 30 Hun., 72; Hatch v. Am. Union Tel. Co., 9 Abbot M. C., 223; Waterbury v. Mer. Union Exp. Co., 50 Barb., 147; Hawes v. Oakland, 104 U. S., 450.
. . The case of Hodge v. United States Steel Corporation et al, 64 N. J. Eq., 111, very clearly points out this distinction between suits prosecuted by a stockholder in a representative capacity and one in an individual capacity. The two phases of the question and the authorities bearing thereon are carefully reviewed and this statement is made by the court:
“And the rule as to refusing protection by injunction, or declining to hear the case of complainant because of his improper motives in acquiring his rights, or the improper purposes of enforcing them by suit, has not been extended in England to cases where the complainant is asserting a right of property 'inherent in himself as stockholder, or otherwise.”
And the court refers to a subsequent English case decided by the Court of Appeals in 1888, viz.: Mutter v. Ry. Co., 38 Ch. Div., 92, where an action was brought by a stockholder at the instance of a rival company and for the purpose of demanding the right to inspect the register of stock, a right which was given by statute. The court allowed the action, stating that' the rule laid down in the Forrest ease was not applicable, and as Emery, V. C., in Hodge v. United States Steel Corporation, supra, states:
“There are no decisions in our courts relating to the control of the court over suits brought by a stockholder assuming solely to represent the company, by reason of his improper motives m prosecuting the suit, but where the suit concerns or is based on the complainant’s own property rights, either legal or equitable, it is settled in our courts that the bad motives of the litigant in insisting upon his equitable rights can not be considered as a basis for refusing to recognize his rights.”
On the other hand, .where the end of.the relief sought by the stockholder is such that it is designed to protect and preserve his individual right of property, and is brought by him to prevent some illegal act on the part either of its officers and directors *661 or agents, which if committed will destroy, injure or seriously jeopardize his rights as a member of such corporation, then courts of equity, even though they will grant equitable relief, will not inquire into the motive; even if such an action is brought with some ulterior motive, some object or purpose other and in addition to the equitable relief which he seeks, jit will be regarded as immaterial. ■ Courts of equity in such eases will not even inquire into the alleged motive or ulterior purpose, where there is a strict legal right of ownership and there are clear violations of duty on the part of officers and directors of a corporation which will materially injure the legal right of ownership of the stock.
These authorities have been carefully examined and the rule which has now been stated is well established. Without further quotation, the following authorities are cited in support of the last stated proposition: Hodge v. U. S. Steel Cor., 64 N. J. Eq., 111; Elkins v. R. R. Co., 36 N. J. Eq., 5; Mutter v. N. & M. Ry., 38 Ch. Div., 92; Carson v. Ia. City Gaslight Co., 80 Ia., 638 (1890); Central R. R. Co. v. Collins et al, 40 Ga., 582; R. R. Co. v. Woods, 88 Ala., 630; Frasier v. Whalley, 2 Hem. & Miller, 10.
Particular comment, however, might be made upon two of the cases just cited. That of Carson v. Iowa City Gaslight Company, supra, was a clear case where -the sole object of the litigation and of the purchase of the stock was to prevent another company from carrying out an illegal contract made by it. The Iowa City Gaslight Company had no right to enter into a certain contract with Iowa City for the purpose of supplying light. The plaintiff in the action was a member of another company which was seeking to obtain the contract with the city for his company. Being unable to do so, and the city having made the contract with the Iowa City Gaslight Company in contravention of law, the plaintiff purchased stock in the Iowa City Gaslight Company which had been pledged as collateral, for the sole purpose of .bringing the action and having the contract made by the company with the city declared illegal. The court held that the motive made no difference. The rule is well stated in Hodge v. United States Steel Corporation, supra, as follows:
*662 ‘ ‘ That the motive of a complainant in prosecuting an equitable property right is to be bought off is not a reason for dismissing the ease and refusing to try the question of right. Complainant is entitled to have the question of such alleged equitable right tried. If the complainant’s rights are legal as well as equitable, the court of equity may perhaps, on the final hearing or on the application for preliminary injunction, consider the question of motive as bearing upon the rights to equitable relief or remitting complainant to his purely legal rights. But where his property rights are equitable only it would seem to be clear that whatever his motives in prosecuting the suit may be, he is not only entitled to have his case heard on final hearing, but also to have the protection of preliminary injunction, if his right be sufficiently established and such protection is absolutely necessary for the protection pendente lite of the equitable right.”
The case of Rice v. Standard, Oil Company, 134 N. Y., 174, is another striking illustration of the rule. There Rice purchased a certain number of Standard Oil Trust certificates for the sole purpose of gaining information and being admitted to the. meetings, to further his war upon the Standard Oil Company which he had prosecuted for so many years as an independent oil refiner. The court disregarded the motive, recognized his legal right to have the stock transferred on the books of the defendant, and so ordered.
Applicability op Equity Rule 94.
It is urged by counsel for the defendant that Equity Rule 94 promulgated by the Supreme Court of the United States is not alone a rule of practice, but that it has been declared to embrace sound substantive equitable principles applicable to suits by stockholders against a corporation, and that it shall be applied in state courts as well as in federal courts upon that theory.
The purpose of Equity Rule 94 is well explained by the Supreme Court of the United States in Venner v. Great Northern Railway Company, 209 U. S., page 33. The rule requires in substance that stockholders who institute actions in the federal courts against corporations shall state the time when they secured their stock so as to disclose whether or not the stock was procured before or after the occurrences of the acts complained of in the action. Equity Rule 94 reads as follows:
*663 ‘ ‘ Every bill brought by one or more stockholders in a corporation against thé corporation and other parties, founded on rights which may be properly asserted by the corporation, must be verified by oath, and must contain an allegation that the plaintiff was a shareholder at the time of the transaction of which he complains, or that his share had devolved upon him since by operation of law; and that the suit is not a collusive one to confer upon a court of the United States jurisdiction of an acción of which it would not otherwise have cognizance. It must also set forth with particularity the efforts of the plaintiff to secure such action as he desires on the part of the managing directors or trustees, and, if necessary, of the stockholders, and the causes of his failure to obtain such action. ’ ’
In Venner v. Great Northern Railway Company, supra, Mr. Justice Moody says:
“The rule simply expresses the principles which this court, after a review of the authorities, had declared in Hawes v. Oakland, 104 United States, 450, to be applicable in the decision of a stockholder’s suit of the kind now under consideration. Neither the rule nor the decision from which it was derived deals with the question of the jurisdiction of the courts, but only prescribes the manner in which the jurisdiction shall be exercised. If a controversy of this general nature is brought in the circuit court and the necessary diversity of citizenship exists, but upon the pleadings or the proofs it appears that the principal has not shown a case within the decision in Hawes v. Oakland, or the rule of court declaratory of that decision, the bill should be. dismissed for want of equity and not for want of jurisdiction.”
It is apparent that the purpose of the rule was to require the stockholder. instituting the action in the federal court to disclose in the petition facts which on their face would- entitle him to equitable intervention. And it is believed from the statement above made by the Supreme Court of the United States that the rule embraces a sound legal principle and not alone a rule of practice.
There has been evident confusion in the state courts' as to the true interpretation of this rule and of its applicability in state practice. By some state courts it is considered a rule of practice in federal courts alone, and not therefore in any wise applicable to cases in state courts as a rule of practice. Nor do the *664 state courts interpret it as an annunciation of a principle of law necessarily applicable to actions in state courts. Even the lower federal courts have experienced some difficulty in operating under this rule because they have held it not to apply to eases removed to the federal courts, which shows that those courts have viewed it more as a rule of practice. Edwards v. Mercantile Trust Co., 124 Fed., 381; Elkins v. Chicago, 119 Fed., 957; Taylor v. D. N. & Co., 112 Fed., 449.
But it is considered that the rule applies only to suits by a stockholder to enforce a right of the corporation, and not to suits to enforce individual rights of the stockholder, such as a suit for rescission of a contract of subscription to shares on the ground of fraud, or to suits for dissolution and winding up of the corporation. Machen Corporations, Section 1170.
It will be noticed that Dissette v. Lawrence Pub. Co., 9 C.C. (N.S.), 118, 120, seems to regard it'rather as a rule of practice. The court calls attention in that case to the decision of Moore v. S. V. Mining Co., 104 N. C., 534, wherein it was held that the rule had no application to federal courts.
It would seem to have been demonstrated in the previous discussion as to the capacity in which the plaintiffs in this action have acted in instituting it, is sufficient to make any consideration or further discussion of this subject of any consequence. While the petition in this case has alleged at great length many acts and conduct on the part of the defendant company, its officers and agents, covering periods of time long antedating the ownership of the stock on the part of the defendants-, as before pointed out it is only incidental and made for the purpose of leading up to the acts that are now complained of. The conclusion, however, on this point is that on the present submission, the plaintiffs have the right to maintain this action, to contest the alleged irregularities, because this action is held to be one not brought by the plaintiffs in their representative capacity, but in their individual capacity as stockholders standing on their strict legal property rights.
The remaining questions will therefore now be considered.
*665 Second: Legality of the Ownership of the Common Stock of the Dependant Company by the Chesapeake & Ohio Railway Company.
This seems to be the logical order of consideration,- by reason of the claim that the officers of the Chesapeake & Ohio Railway Company now constitute a majority of the directors and officers of the defendant company, who are charged with conspiring to retire the preferred stock as a means towards the end of securing the control of the company, with a view of committing it to a monopolistic scheme and conspiracy. The soundness of such contention may have much bearing upon the legal propriety of the retirement of the preferred stock. This inquiry is made with the fundamental principle of corporate law in mind that, except for certain express purposes usually sanctioned or prescribed by legislative provision, it is contrary to public policy for one corporation to acquire and own a majority of the stock of another corporation, and thereby directly or indirectly take possession of and manage the business of such corporation. The theory is that the corporation so taking control of another corporation and assuming to manage its affairs, even indirectly, as it would seem that the Chesapeake & Ohio is doing in this ease, engages in a business other than that authorized by its charter, and such transaction is opposed to public policy and void under the circumstances either prohibited by positive law, or contrary to the general policy of the state, as contained in the' adjudications by the courts.
A foreign corporation qualifying itself to engage in business in this state subjects itself to the positive enactments, of the state, and must conform its acts to the general spirit and policy of our law. It yields or rather waives the powers and privileges granted it by the charter rights of the state of its creation, and agrees to conform its acts to our law.
The policy of our law extends not alone to domestic corporations, but embraces foreign as well. It is for the courts of -this state to determine the rights of foreign corporations, looking to their charter rights, to our law and policy, and its applicability to foreign corporations.
*666 The same exercise of control ean be made by this state over acts of foreign corporations as of domestic corporations. If, for example, a Virginia corporation can legally do what is prohibited of an Ohio corporation, then -the foreign corporation is allowed to transact business in Ohio on conditions more favorable than those prescribed for its domestic corporations. This is forbidden. Coler v. Tacoma Ry., 65 N. J. Eq., 347; 103 American St., 786.
There are prescribed limitations as to the ownership of stock by one Ohio railroad corporation in another railroad corporation. When such railroad corporation acquires stock in another railroad corporation within the limitation of the statutes authorizing it, then such ownership may be considered a perfect or legal one; but when such ownership is beyond the limitations of our laws and policy, then it does not partake of the fullness of perfect ownership; it is in law an imperfect ownership conferring the right of enjoyment and disposition of the property only when that can be done without injury to the rights of others. It may collect dividends and dispose of them, yet it does not have any power to vote the stock at elections of officers or to in any wise govern and manage the affairs of the corporation. State v. Newman, 51 L. A. N., 838; 72 American St., 457.
It has been held that as the holding of stock by one corporation in another naturally tends to create, or at least to aid and encourage monopolies, it is not sustainable under any circumstances when it appears that the acquisition of such stock is for the purpose of obtaining the control of another corporation and thereby enabling a .single corporation .to possess and exercise the franchises and control the business operations of the two or more corporations. Hotel Co. v. Schram, 36 Amer. St, 134.
The doctrine of these cases, however, did not concern railroads. But this rule, unless specifically provided otherwise by statute, would seem to apply to railroad corporations in matters beyond the limitations of statutory provisions covering certain specified things. As already stated, it would apply to foreign as well as domestic corporations. The rule of comity obtaining between the states of the Union goes no further than to permit' *667 a foreign corporation to exercise in a foreign state the general powers conferred by its own charter, only when the powers sought to be exercised 'are “either in the direct enactments of the latter state (foreign state) or by its public policy to be deduced from the general course of its legislation or from the settled adjudications of its highest court. ’ ’ Christian Union v. Yount, 101 U. S., 352; Clark v. Railroad, 50 Fed., 538; Floyd v. Loan Co., 49 W. Va., 327; Harding v. Glucose Co., 182 Ill., 551 (74 Amer. St., 189); Dunbar v. Tel. Co., 224 Ill., 9.
Public policy in general is found expressed in this state in Railway Co. v. Iron Co., supra, and in Sections 8683, 8806, 8807 and 8808 of our General Code.
It has been specifically provided by statute .that this broad condemnation of the purchase of stock by one corporation in another is modified in the respects contained in the General Code, Section 8683 and those above mentioned. The applicability of Section 8683 to the present transaction will not now be discussed.
A consideration of the numerous decisions in the country, condemnatory of the purchase by one corporation of the stock of another, especially concerning railroads, tends to elucidate and explain the policy of this state as it is embodied in our code touching these acts by railroad companies. Any extended review of the decisions is unnecessary because it is axiomatic and familiar to all. The purchase of stock in any other railroad with intent to use the power thus acquired to secure an interest in the management, either for good or evil, is contrary to the public policy of our commonwealths and nation which is to secure a reasonable competition between the roads for public patronage.
Railroad Co. v. Collins, 40 Ga., 582:
‘ ‘ The policy of the law is based not alone on the charge to the public weal, but also upon the theory that the purchase of stock by one railroad in another may be used in controlling the latter by the election of directors and officers from its own board of directors, resulting in oppression and fraud in the management of the latter, diminishing its profits and enriching the former.”
Railroad Co. v. Woods, 88 Ala., 630:
“If the intent and purpose of securing the control and man *668 agement of one corporation by another by a purchase of stock is to defeat or lessen competition in the business of the two corporations, or if it is designed and will tend to create monopoly or general restrictions in trade and commerce, a court, of equity at the suit of minority stockholders will restrain the purchasing corporation from owning the majority of the stock, and from the use of it in the management of the affairs of the other corporation and in the election of officers. ’ ’
George v. Railroad Co., 101 Ala., 607:
“The intent and purpose of those who are seeking to accomplish such condemned objects as has so often been observed by the courts, is not determined by what they say, but by the natural tendency and effect thereof. The highest authority, and the truest expression of this idea is embodied in Perseal v. Great Northern Railway Co., 101 U .S., 646.”
Among the wholesome things stated by the learned court in that case put tersely, is the following:
“Whether the consolidation of competing lines will necessarily result in the increase of rates and in detriment to the public, it certainly puts it in the power of the consolidating corporations to give it that effect; or puts the public at the mercy of the corporation.
“While the single management may reduce expenses, the logical effect of all monopolies is an increase in price.
“Recognizing that railways become necessarily monopolists, yet the general sentiment declares that such monopolies be limited to the necessity of the case.”
Sections 8683, 8806, 8807 and 8808, Declaratory in Statutory Form oe ti-ie Public Policy oe the State.
Keeping in mind the settled general policies of the law as herein outlined other than that resting on statute, we will now consider the public policy of the state concerning the acquisition by one railroad 'of the controlling interest in another, as found in the statutes and decisions of our courts. First will be considered Section, 8806. The applicability of 8683 to this transaction will not be considered until 8806 is disposed of. By the provisions of 8806 one railroad company “may aid another in the construction of its road by means of subscription to its capital stock, or otherwise, for the purpose of forming a connec *669 tion of the roads of the companies, if the road of the company so aided will not when constructed form a competing line. ’ ’
It can not be claimed that the Chesapeake & Ohio Railway Company may legally purchase the stock of the Hocking Valley Railway Company under this provision. The limitation of the aid by one railroad to another is in the construction of its road, and for the purpose of forming a connection of the roads of the companies. The other limitation is that the road so aided must not, when constructed, form a competing line. If it is not within the letter of this section, is the purchase of stock within the spirit .thereof?
The avowed purpose of the Chesapeake & Ohio Railway in the purchase of the stock of the Hocking Valley is to use the defendant’s line to form a continuous trunk line from the coast to the Great Lakes. For whose benefit it may be inquired ? Is the Chesapeake & Ohio Railway Company making this purchase of the stock of the Hocking Valley for the benefit of the Hocking Valley road and its stockholders, or is it made for the benefit of the Chesapeake & Ohio Railway Company itself. The answer seems to be that the acts of the Chesapeake & Ohio Railway Company as disclosed in this case indicates that it is for the benefit of the Chesapeake-& Ohio Railway Company itself. It is admitted that it has long desired this through line convenience. It is not controverted that it was one of the members of the Trunk Line Syndicate which for a long period of time we may safely say controlled the general policy and affairs of the Hocking Valley prior to the -circuit court decree. It no doubt enjoyed about the same facilities under that arrangement as it will under the proposed new arrangement, without as much expenditure as it claims to have made now in the purchase of the stock of the defendant. But the right to make such arrangement for the purpose of forming a connection of the roads by the purchase of stock is limited to the construction of a road which must not be a competing line. It seems clear that the only legitimate way, if ait all, in which the Chesapeake & Ohio Railway may accomplish its desires to use the Hocking Valley for the purpose of a through trunk line, is by virtue of the provi *670 sions of Section 8808, provided, however, that its connection with the Kanawha & Michigan is proper and legal.
Under the section last mentioned “two or more companies whose lines are connecting and not competing may enter into an arrangement for their common benefit consistent with and calculated to promote the objects for which they were created.”
But it is doubtful whether even this statute would cover their desires and purposes. The Hocking Yalley and the Chesapeake & Ohio are not in reality connected lines. The line of the Kanawha & Michigan Railway intervenes between the lines of the Hocking Yalley and the Toledo & Ohio Central Railway Companies. The nearest approach that the Hocking Yalley and Chesapeake & Ohio Railway become- to being connected lines, as appears from the evidence, is shown by the arrangement which the Chesapeake & Ohio Railway Company and the Lake Shore have made for the dismemberment of the former illegal alliance of the Hocking Yalley, for the joint use of the Kanawha & Michigan Railway Company for connecting purposes for these two roads in the very convenient plan which they have made for Hocking’ Yalley and the Toledo & Ohio Central Railway.
In order to justify a court of equity in looking with favor upon the plan outlined in the evidence in this case for the joint operation of the Chesapeake & Ohio and the Lake Shore road, it would be necessary to ignore the corporate entity of the Kanawha & Michigan Railway as an independent corporation, and consider the ownership as evidenced by the ownership of the stock in the Kanawha & Michigan by the Chesapeake & Ohio and the Lake Shore roads, which can not be done.
Looking to the unfortunately situated Kanawha & Michigan in -the light of being a part of the Chesapeake & Ohio Railway for the purpose of determining whether the Chesapeake & Ohio Railway is a connecting line with the Hocking Yalley, the conclusion must be that the joint ownership of the stock of the Kanawha & Michigan by the Chesapeake & Ohio Railway and the Lake Shore is just as inimical to the fundamentals of the law, other than statutory which has been here stated, as is the ownership of the stock of the Hocking Yalley by the Chesapeake & Ohio Railway.
*671 It may be remarked, in passing, that tbe claims made in the presentation of this case as to the use and abuse of the Kanawha & Michigan Railway Company (if it be controlled) as to its being made a dumping road in the matter of equipment, is an illustration of what might be the result if the Hocking Valley is to be used by the Chesapeake & Ohio Railway as a part of its through line, which of course would inure to the great detriment of the stockholders. Of course if a railroad company may bodily own another railroad company by buying up all or nearly all of its capital stock, there are no stockholders to consider. But the policy of the law has always been that a railroad company can never own another railroad unless it purchases the property and assets in a straightforward way and in the manner prescribed by law. What it can not do directly certainly can not be done indirectly. The law will not countenance such things.
The conclusion is that there is no authority under either Sections 8806 or 8808 authorizing the Chesapeake & Ohio Railway to purchase and own the majority or any part of the Hocking Valley Railway stock.
Applicability op Section 8683 to this Transaction.
It was urged in argument, and an Q additional brief has been furnished since by counsel for the defendant, that the provisions of Section 8683 apply and authorize the Chesapeake & Ohio Railway Company to purchase the stock of the Hocking Valley. There has not been any discussion either in argument or in the briefs to any great extent upon this-proposition. Section 8683 provides:
“A private corporation also may purchase or otherwise acquire, and hold shares of stock in other kindred but not competing corporations, domestic or foreign. This shall not authorize the formation of a trust or combination for the purpose of restricting trade or competition.”
It is claimed by counsel for the defendant that Title 9 of the new General Code deals exclusively with private corporations, and expressly states in the title that the subject of private cor *672 porations includes not only corporations organized for general purposes but also railroad corporations, and therefore clearly indicates an intention upon the part of the Legislature to make che section of the code in question applicable to railways as well as other corporations. The court is unable to verify this claim of counsel. All that appears on page 1825 in the title is “subdivision 1; railroads.” Division 1 of the general title of private corporations embraces chapter one which relates to organization and powers of private corporations. Division 2 embraces public service corporations, and under this appears subdivision 1, “railroads.”
In the previous Bates Revised Statutes, being title 2, Corporations, chapter 1, entitled “Creation of corporations and general provisions,” contains Section 3256 which is now Section 8683. Following chapter 1 under title 2, Corporations, is found chapter 2, “Railroad companies”; and in this chapter are found all special provisions conferring special powers upon railroad corporations as a class. In order to determine the applicability of 8683, formerly 3256, it will be necessary to consider the relative history of these two sections, how and when they came into existence and the purpose for Avhich they were enacted. Section 8683, formerly 3256, first appeared in the Revised Statutes of 1880 and provided merely that:
“A corporation may borrow money not exceeding the amount of its capital stock, and issue its notes or coupons or registered bonds therefor, bearing any rate of interest authorized by law, and may secure the payment of the same by a mortgage on its real or personal property or both.”
The next amendment of this section was made April 15, 1902 (95 O. L., 151). The only change there was; the omission of the words “authorized by its articles of incorporation.”
At the same session of the Legislature, 95 O. L., 390, the same section was amended by the addition of what is now 8683, to-wit: “and a private corporation may purchase or otherwise acquire and hold shares of stock in another kindred, but not competing private corporation, whether domestic or foreign, but this shall not authorize the formation ofi any trust or combination'for the purpose of restraining trade or competition.”
*673 Therefore, the present section was brought into onr statutory-law May 6th, 1902. Section 8806, formerly Section 3300, had its inception in Swan & Critchfield, 281, and read as follows:
“And railroad company heretofore or hereafter incorporated-may at any time by means of subscription to the capital stock of any other company, or otherwise aid such company in the construction of its railroad for the purpose of forming a connection of said last mentioned road with the road owned by the company furnishing said aid. ’ ’
This section of the statute as it there appeared contained the other provisions, which are now a part of Section 8806, 8807 and 8808. The portion just quoted from Swan & Critchfield remained unchanged except in 70 O. L., 129, the addition was made, “where the road of the company so to be aided does not form a competing line.” This- provision then came into our law April 15th, 1873, that is, the principle that there shall be no aid by one road to another where the road aided will be a competing line.
There was no change made, in Section 3300 in the amendment in 79 O. L., 35,. so far as concerns the portion of the statute now involved.
It, therefore, follows that this special limited power for a particular purpose thus granted to railroad corporations was a part of the statutory law of the state many years before the provision in 8683 became a part of our law.
It becomes, therefore, a matter of legal statutory construction in order to determine the applicability of 8683 to the present transaction.
The rule is stated in Allen v. Russel, 39 O. S., 336-337, that:
‘ ‘ Where all the general statutes of a state, or all on a particular subject are revised and consolidated there is a strong presumption that the same construction which the statute received, or if their interpretation has leen called for, would certainly have received, before revision and consolidation should be applied to the enactment in its revised and consolidated form, although the language may have been changed.”
Though there may not be much occasion for the applicability of this rule to the present question, the quotation is furnished by *674 re.ason of the claim made by counsel as to the purport of the title of Chapter 9 in the new General Code. The application of old Section 3300 (new Section 8683), to the present transaction is, therefore, a matter of judicial construction. And the rule 'governing the same is clear and well established.
The general subject covered in Section 8683 is the subscription of stock by one corporation in that of another. And no special mention or provision is made therein concerning railroads. This general provision came into our law in 1873. Long prior to that period there had been a fundamental rule established by the statute that railroad corporations could subscribe for the stock in any other railroad company whenever such other railroad company was engaged in the construction of a line. The conditions and limitations upon which such subscription were that it was to be a connecting line and not in any sense a competing line. To allow 8683 to apply to railroad companies would authorize one railroad corporation to reach out away beyond its territory and purchase stock in any other railroad which was not competing, and thus evade the limitations •that are prescribed in the special powers that are granted to railroad corporations.
The rule of statutory construction is found expressed in a number of Ohio cases. In Fostic v. Village, etc., 14 O. S., 472, it is held that:-
“It is an established rule in the construction of statutes that a subsequent statute treating a subject in general terms, and not expressly contradicting the provisions of a prior act shall not be considered as intended to affect more particularly the positive provisions of the entire act, unless it be absolutely necessary to do so, in order to give its words any meaning.”
Sedgwick on Statutory Law, states at page 123:
“In regard to the mode in which laws may be repealed by subsequent legislation it is laid down as a rule that the general statute without negative words will not repeal the particular provisions of a former one unless the two acts are irreconcilable and consistent. The reason and philosophy of the rule is that when the mind of the legislator has been turned to the details of a subject and he has acted upon it, a subsequent statute in *675 general terms, or treating a subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive provisions unless it is absolutely necessary to give the latter act such a construction in order that its words shall have any meaning at all.”
In Cincinnati v. Holmes, 56 O. S., 104, on page 114, it is stated:
“It is a rule constantly observed in the construction of statutes that where the general provisions of a statute conflict with the more specific provisions of another or are incompatible with its provisions, the latter is to be read as an exception to the former. ’ ’
In Thomas v. Evans, 73 O. S., 140, it is stated in the syllabus:
“Where the general provisions of a statute are found to be in conflict with the express provisions of a later act relating to a particular subject, the later act will govern, although the words of the earlier general'act standing alone will be broad enough to include the subject to which the more particular provisions relate.”
In the case at hand, the general provision was brought into the law long after the special provision relating to railroads had been part of the statutory law, which it would seem, makes the case all' the more strong.
It seems, therefore, that the holding is justified that Section 8683 does not apply. But, even if it should be construed to authorize one railroad company to purchase the stock in another railroad corporation under its terms as applied to the facts of the case in hand, the inevitable conclusion must be that the Chesapeake & Ohio Railway Company still may not have the legal right to purchase the stock of the Hocking Yalley to the extent shown in this case. And this presents the question, therefore, whether or not the Chesapeake & Ohio Railway Company and the Hocking Yalley are to be regarded as competing lines.
It has been stated in argument, the reason or urgent necessity for the Chesapeake & Ohio obtaining control of the Hocking Yalley is in order to secure a through direct line from the sea to the great lakes. It is stated that it is the desire to make of the *676 Chesapeake. & Ohio, the Kanawha & Michigan Railway, and the Hocking Valley Railway a great trunk line. It has been stated by counsel for the defendant that heretofore the freight of the Chesapeake & Ohio destined to points on the lakes had to. be carried over its lines from the coast to the city of Cincinnati, and from there to Toledo, which makes a much longer haul. It would seem that this alone justifies the implication that there was some natural competition between the Hocking Valley and the Chesapeake & Ohio. The Chesapeake & Ohio could have routed freight destined for Toledo over its own line and that of the Hocking Valley, and the Hocking Valley then would have been a road which drew from the same territory as did the Chesapeake & Ohio.
But the strongest reason that may. be advanced supporting the view that the Chesapeake & Ohio Railroad is to be regarded as a!competing line is the view that between the Chesapeake & Ohio and the Hocking Valley is an insurmountable barrier in the road of the Kanawha & Michigan Railway, which has been held by the Circuit Court of Franklin County .to be a competing line with the Hocking Valley. In seeking to apparently comply with the decree of the circuit court, the arrangement which has been made between two of the trunk lines which formerly constituted the Trunk Line Syndicate, the existence of which is clear and beyond doubt, is that the Chesapeake & Ohio and the Lake Shore are to operate jointly the Kanawha & Michigan Railway Company. It is admitted by counsel for the defendant that their scheme to make the Chesapeake & Ohio a trunk line from the coast to the great lakes embraces the joint operation of the Kanawha & Michigan Railway Company by the two roads mentioned.
It is urged that in determining whether or not railroads are parallel and competing among other things to be considered is their condition, general business, markets reached, connections, relations and arrangements with other railroads, and opportunities to compete; that it is not necessary that the railroads should touch at any point or be competitors for local business or that they should have any special title to or arrangement with other *677 roads over which, they reach the same markets in order to make them parallel and competing; that it is sufficient that competition for through business to different points exists. State v. Vanderbilt, 37 O. S., 590.
Competing lines .of railway having the same general direction and therefore likely to come in competition with' each other may be competing. If the principal business of two lines is throiigh traffic to the same points, they are considered competing. R. R. v. Jarvis, 92 Fed., 735, 741.
“Competition between’railroads may exist and yet their lines not run parallel, or cross each other at some point on their route. R. R. Co. v. Rushing, 69 Tex., 306.
“Railway companies by reason of their relations with the control or management of other lines than their own may become within the meaning of the law competing lines though the railways owned by them may not in fact connect. ” R. R. Co. v. Texas, 75 Tex., 434; Pennsylvania v. Commonwealth, 3 Pa. St., 100; 7 Atlantic, 368.
The principles of these authorities apply and at least justify the action of the court at this time and upon the showing made to apply them for the purpose of granting the temporary relief asked, so that the question of the competitive character of the Chesapeake & Ohio Railway Company may be inquired into more fully. If there is a shadow or serious doubt about the right of the Chesapeake & Ohio Railway Company to own the stock in question, and thereby secure virtual control of the Hocking Valley, it should be stayed until full investigation can be made.
There is still another stronger reason for denying the Chesapeake & Ohio Railway Company the right or privilege of ownership in the stock and thereby giving it full control over the defendant company. In view of all of the authorities and in view of the admitted arrangements that have been made between the Lake Shore and the Chesapeake & Ohio Railway Companies with reference to the plan of operation over the roads that have been heretofore involved in the illegal combination, there seems to be no doubt but that the contemplated action will result in a monopoly or in such a general restraint of trade as will *678 warrant relief both at the request of stockholders and at the request of the state as well.
Section 8683 Does Not Apply Because op Section 8737.
The question of the applicability of 8683 was considered and the history of the statutory law relating to the purchase of stock was made without having in- mind Section 8737. It is now believed that Section 8737 conclusively settles the whole controversy. 8683 appears in the chapter relating to the general powers of corporations. 8737 of that chapter provides as follows :
“This chapter does not apply when special provision is made in subsequent chapters of this title, but the special provision shall govern unless it appear that the provision is cumulative.”
As hereinbefore pointed out, there are special provisions prescribing a special rule of policy as applied to railroad corporations which clearly appear to deal exclusively with railroad corporations. The reasons for these special provisions as applicable to railroad -corporations, and not to other private corporations, are readily apparent.
It is the opinion of the court that the section just considered is conclusive.
Retirement of the Fifteen Million Preferred Stock.
We come now to the question of retirement of the preferred stock, which is whether it may be done through the action of the directors alone, or whether the stockholders must give their assent thereto in addition to the action of the directors.
The strict legal question involves what may be termed corporate power. Looking at it abstractly it is whether the directors can exercise this corporate power, or whether it rests exclusively with the stockholders according to the fundamental law of the corporation.
By the articles of incorporation of the Hocking Yalley Railway Company it is provided:
“All preferred stock is and will be subject to the right of the company to redeem at par at any time after three years from the date of its issue.”
*679 This provision is incorporated into the certificates of stock thus making it part of the contract between stockholder and company. It follows that preferred stockholders can not complain or object to the retirement when the corporation takes the proper legal action for that purpose. ^
Digressing for a moment, and considering the broader questions that are involved in this case as hereinbefore outlined, it will be remembered- that by reason of the resignations of certain of the old directors and the selection of new ones to take their place on March 22d, 1910, the Chesapeake & Ohio Railway Company through its officers, directors and agents, came into control of the board of directors of the Hocking Yalley Railway.’ The vice of permitting such ownership of stock as that of the C. & O. Railway in the Hocking Yalley is at once apparent in the action taken by this new board, the predominanting influence of which is the Chesapeake & Ohio Railway Company, to retire the stock. The resolution to retire the stock was passed April 1st, 1910. The -ownership of the preferred stock may be said to be the only pure legal ownership there is -of the stock of defendant, it having been stated and admitted that there are about twelve hundred persons who own this stock, it being the only “non-railroading owned” stock in the company excepting. avVery few shares of the common stock.
It is manifest that the action of the directors, a majority of whom are acting in a dual capacity, was but one of the steps taken in pursuance of the plan and scheme to give -the C. & O. Railway absolute control over the Hocking Yalley. As long as the preferred stock is outstanding, and owned by others than the C. & O. Railway, the latter can not obtain control. But with the preferred stock retired and more common stock issued and which may and more than likely would be purchased by the C. & O. Railway, the latter would thereby come into absolute control. To permit such action would be to give sanction to the circumvention of Sections 8807 and 8808, which provides the only legal way for the taking over of the control of one railroad by another.
Conceding that the new directors who have come from the C. & O. Railway have nominally qualified themselves by indi *680 vidual ownership of stock in the Hocking Yalley as they probably have done, the court can not shut its eyes and ignore the plain purpose, or if not a distinct purpose, the natural result of the retirement of the preferred stock, is giving the entire control of the Hocking Yalley to the C. & O. Railway. If the C. & O. Railway desired to obtain control of the Hocking Yalley, they should have done it in the manner prescribed by law. To undertake to secure control by means of stock ownership, and by placing its own officers and agents on the official directory of the Hocking Yalley, under the pretense of having their officers act as officers and directors of all the stockholders of. the Hocking Yalley, is to deliberately trample under foot the rights of Iona fide stockholders; is rather a sharp practice, and one which a court of equity should not tolerate. Some of this language is adopted from the case next to be cited, it being particularly applicable to the present situation.
Directors whose personal and official relation with another corporation which seeks to control the one in which they are acting, concerning a matter of vital interest to both corporations, such as the retirement of the preferred stock, in order to secure control of the corporation, can not help but be in an adverse attitude to one or the other companies. It is fundamental, as stated in an Ohio case, that—
“A director whose personal interests are adverse to those of the corporation has no right to be or act as a director. As soon as he finds that he has personal interests which are in conflict with those of the company, he ought to resign. No matter if a majority of the stockholders, as well as himself; have personal interests in conflict with those of the company. He does not represent them as persons, or represent their personal interests as such. He is trustee for the company and whenever he acts against its interests—no matter how much he thereby benefits foreign interests of individual stockholders—he is guilty of a breach of trust, and a court of equity will set his acts aside at the instance of stockholders.” Goodin v. Canal Co., 18 O. S., 169-183.
The directors of the Hocking Yalley who have recently- been selected from the official roster of the C. & O. Railway must be *681 held to be representing the personal interests of the Chesapeake & Ohio Railway Company in its desires to use the IToeking Valley as a through trunk line. There can be no other conclusion than this considering the evidence and the' admissionss of counsel for the defendant. Counsel for defendant advance in argument, and it appears clearly from the evidence, that the principal reason for the ownership of the stock of the Hocking Valley by the O. & O. Railway is to avoid the long haul of its freight over its line to Cincinnati and from thence over the C., H. & D. to the great lakes, and to make use of the Hocking Valley as a more direct' so-called trunk line from the coast .to the lakes. Indeed a strong inference may be drawn from all the evidence looking to a continuation of the operation and manipulation of the clearly established Trunk Line Syndicate.
The acts of such directors thus standing in a dual capacity in the retirement of the preferred stock, being clearly in the interest of their own company, the C. & O. Railway, and in furtherance of the scheme to turn the control of the Hocking Valley over to the C. & O. Railway is illegal and void on broad principles of equity. It is within the spirit of the rule expressed in Goodin v. Canal Co., 18 O. S., where it is stated that:
“A railroad company having purchased a majority of shares of stock in a canal company, elected for the latter a board of directors who were in the interests of the railroad company, and then, with the assent of said board appropriated the entire canal and property of the canal company as a railroad company, paying therefor a price or compensation which was agreed upon by the two companies, but which was far below the actual value of the properties.”
The rule of law applicable to the conflicting interests of directors situated as are the majority of those of the defendant, being representatives of both the Hocking Valley and the C. & O. Railway, is well expressed in Memphis R. R. Co. v. Woods, 88 Ala., 630 (16 Am. St., 81), as follows-.
“We hold that it is equally against public policy, and against that sound rule which disables trustees, or quasi trustees, to act *682 when their duty and interest conflict, that the East Tenn. V. & G. Company should be allowed to vote its majority stock in matters pertaining to the-management and control of the Memphis & Charleston Company.
“We confine our ruling, however, to eases like this one, where a conflict of interest may arise, in.,the matter of expenditures and their .apportionment in the division of patronage and of earnings and to rivalry between separate companies having substantially the same field of operation or where the profits of one enterprise will naturally be enhanced by the diminution of those of the other. * * *
“Men must be dealt with, not .as faultless, but as frail, and subject of temptation, too strong for their powers of resistance. Civil liberty is but natural liberty shorn of its power to transgress the boundary which separate meum and tuum in its eonprehensive sense. Hence it is that the law, with inflexible purpose, has placed restraints on transactions in which duty and interest conflict. Hence it is that, when any relation of trust or confidence exists, the law scrutinizes with earnest if not with severe vigilance any pecuniary transaction which may be had between parties thus circumstanced. Hence it is that,- when any man stands in a fiduciary relation to another, any contract, etc., had with the beneficiary is invalid at the mere option of the latter, if seasonably expressed,” etc.
In the case just considered the ownership of stock in one railroad by another, under precisely similar circumstances to the one in hand was condemned, and the exercising of the voting power was enjoined. It was directly charged, as it is here, that the acquirement of the stock was to give the road acquiring it a controlling vote in the road of the other.
Conceding that the Chesapeake & Ohio Railway Company paid value for the stock in the Hocking Valley, the ownership of the majority of the common stock, together with the action of the board of directors, a majority of whom are officers of the C. & O. Railway placed there to do its bidding and carry out its plans, would enable the C. & O. Railway Company to do indirectly what Sections 8807 and 8808 provides they may do in a proper way, if the Hocking Valley is continuous or connected and not competing. But their right to even purchase is not by any means clear, because the lines are not continuous or connected; *683 they were separated by the Kanawha & Michigan ,which is coneededly a competing line with the Hocking Yalley as well as with the C. & O. Railway.
Upon the broad principles of equity herein stated and in view of all the evidence and conclusions upon other questions herein contained, the opinion of the court is that the act of the directors in the resolution to retire the preferred stock is illegal and void.
Having reached such a conclusion, it would seem to render the consideration of the abstract legal power of the directors to retire the preferred stock without assent of the stockholders immaterial.
It seems useless therefore to further consider the claims of counsel for defendant concerning this subject in view of the opinion already expresed. It is indeed difficult to treat the abstract legal right of directors of a railroad corporation to retire preferred stock without action by or consent of the stockholders, in view of the plan or scheme of the Chesapeake & Ohio Railway Company permeating this whole transaction. The strict legal right can not receive impartial thought because of the taint of illegality underlying the acts of the C. & O. Railway and the directors of the defendant and their clear purposes and aims.
As a general proposition it may be observed that in a corporation, where the ownership is perfect and the purposes of the directors are truly in the interest of the corporation and its stockholders, and are not contemplated to encompass any illegal objects, it would seem that neither class of stockholders would have much grounds of complaint. The preferred class are bound by their contract, and when the corporation legally expresses its purpose to exercise the option to retire, there is no alternative but for them to accept. The retirement is then also to the benefit of the common stockholders, because it relieves the corporation from a preferred obligation or burden.
The situation here, however, is that if the matter is submitted =to a general meeting of all stockholders—preferred and common—who have equal voting power, it may be within the power of the preferred class to perpetuate their holdings. It being *684 represented here, however, that the preferred stock is “perfectly” owned stock, the common being nearly all in the hands of the Chesapeake & Ohio Railway, the wisdom of the rule which prevails generally among the authorities in general, to the effect that directors alone can not exercise the option, is at once apparent. If the retirement be permitted now and the conclusion reached as to the ownership of the common stock by the Chesapeake & Ohio Railway is sound, it would place the road in an anomolous condition.
It seems to be uncontrovertible that the retirement of the fifteen million preferred stock amounts to a reduction of the total capital stock of the corporation. It would reduce the capital stock from twenty-six millions to eleven millions.
- But the matter of reduction and increase of stock is expressly provided for by statute as to railroad corporations; and they may only reduce or increase stock in the manner provided. Section 8700 of the code (32645, Revised Statutes), provides for the reduction of stock which must be with the written consent of the persons in whose names a majority thereof stands on the books. Sections 8698 (3262) and 8815 provide that an increase of stock may likewise be made with the consent of the stockholders.
Under the circumstances of this case, in view of the illegal speculations of this late railroad monopoly, and the large amount of assets accumulated and disposed of by it, and of charges in the petition which may bring further assets into the corporation; and in view of the voting powers of the preferred stockholders, it must be held that they have such substantial rights that they ought not to be so summarily disposed of by the illegal methods being pursued in this case without having a voice in the matter.
There is no dissent from the general rules of law that the corporate powers of a corporation, which directors- are authorized to perform are those merely which pertain to the ordinary transactions of the corporation, and not those which concern the' constitutional and fundamental powers of the company and do not embrace the power of reconstruction of the body itself; nor an enlargement or reduction of its capital stock. 2 Machen on *685 Corporations, Section 1438; Widman v. Bowman, 58 Ill., 444; McNulty v. Bank, 164 Ill., 427; R. R. Co. v. Allerton, 18 Wall., 233; Leather Co. v. Kurtz, 34 Mich., 89.
The Ohio eases cited in argument have been examined but they do not change this view. Hackett v. Northern Pacific Ry., 36 N. Y. Misc., 583 (73 N. Y. Supp., 1087), is the only decision found which holds that the. directors are competent to exercise the option. The view was there expressed that the retirement was some time contemplated by the stockholders and was provided for when the issue of the stock was authorized, but conceding that to be true, it does not follow nor demonstrate that the retirement of the stock is not a change in the organic law, because as a matter of fact it constitutes a reduction of the stock, which in Ohio can only be done by consent of stockholders at a meeting thereof.
The vice of this transaction, however, is that the Chesapeake & Ohio Railway, and its representatives on the board of the Hocking Valley, have deliberately planned' to change the organic law of the Hocking Valley by the retirement of the fifteen millions of preferred and the increase of the common stock fifteen millions for the avowed purpose of securing control. This can only be done with the consent of a majority of all the voting stockholders, even if the ownership of’ the majority of the common stock was legal and perfect.
Will Ownership by the Chesapeake & Ohio Railway op a Majority op the Stock op the Hocking Valley and the Consummation op the Plan be in Restraint op Trade?
This question comes into this case for two reasons:
First, because it is claimed that under Section 8763 (3256, R. S.) the Chesapeake & Ohio has the right to purchase the stock in the Hocking Valley—the plaintiffs, to demonstrate that the holding even under that section, if it is authorized, is unlawful because such ownership constitutes a trust or combination within the inhibitions of that statute.
Second, if there is no statute either against or in favor of such holding, the right to ownership is claimed to exist upon general principles of law.
*686 The answer to the last proposition is that it is not because the natural tendency from all the evidence offered in this case is monopolistic.
There is, therefore, no right of ownership by the Chesapeake & Ohio Railway either by warrant of-statute, nor upon general principles. Section 8763 (3256, R. S.) can not apply as already demonstrated, nor can it be held on general principles, because the right of such ownership has been denied by the decision of the Supreme Court.
The ownership of the stock by the Chesapeake & Ohio Railway in the Hocking Valley, together with the arrangements made by the Chesapeake & Ohio Railway Company and the Lake Shore Railway Company for the joint operation and control of the Kanawha & Michigan Railway Company, and the division of the ownership of the property previously owned by the Hocking Valley under the Trunk Line Syndicate tends to show that the natural result and tendency is towards the continuation of the same combination' as previously existed in the Trunk Line Syndicate, which was condemned by the courts of this state. The strongest evidence of this comes from that furnished by the defendants themselves, and appears from the avowed purpose of the Chesapeake & Ohio Railway Company and the Lake Shore & Michigan Southern as admitted by counsel: Furthermore the evidence shows the operation of the illegal trunk line syndicate of which the Hocking Valley was a member, continued down to within a month or so of the commencement of this action. It is conceded by all that the Hocking Valley is chiefly a coal carrying road, occupying a unique position, the control of which by other more powerful roads is a thing greatly desired. The temptation and tendency to continue the unlawful combination, in the language of the Alabama court, “may be too strong for their powers of resistance.” The circumstances tending so strongly in this direction, it seems that the court will be entirely warranted in continuing the temporary injunctive relief so that some of the important matters may be examined into more fully. It is necessary also that this should be done because the Hocking Valley is -an Ohio corporation, a strong road, and it-ought to be legally and properly owned.
*687 It is needless to continue this discussion, already too long, or to cite further authorities.
Right of Stockholders to Enjoin Noting of Share Illegally Acquired.
The right of one or more stockholders to enjoin unlawful acts on the part of the directors, such as the illegal retirement of stock, or the illegal voting of stock unlawfully acquired and owned is clearly established. In the beginning of this opinion the different capacities in which stockholders of a corporation may sue—representative and individual—was discussed. . The construction placed upon the action by the stockholders in this case by the court is that it is brought in the individual capacity for the protection of property rights. It is not brought in a representative capacity because the corporate entity through its board of directors could not bring the action in the name of the corporation to prohibit the acts herein complained of. Nothing further need to be stated, therefore, than to reiterate the rule that a stockholder, a minority stockholder, may enjoin the unlawful retirement of stock, as well as the illegal increase of stock for an illegal purpose, and also to énjoin the'voting of a majority of the capital stock of such corporation held and owned by a railroad corporation contrary to law, as well as to smyktir the directors from committing áfo roacTto" an unlawful scheme or conspiracy in restrain) of trade, which will subject the corporation to. tteioss of its charter at suit of the state. This matter will Je closed by the mere citation of authority. R. R. Co. v. Woods, 88 Ala., 630 (16 Am. St.); Milbank v. Railroad Co., 64 How. Pr., 20; George v. R. R. Co., 101 Ala., 607; Dunbar v. Telegraph Co., 224 Ill., 9; Parsons v. Mining Co., 155 Fed., 869.
Since the case was argued and submitted, a stockholder who has been an owner of a considerable number of shares, has been allowed to intervene, and as to whom no question of motive can be raised such as is made with reference to the recent purchase by some of the plaintiffs of the common stock. This seems to be immaterial, however, in view of the holdings of the court.
*688 Payment of Money for • Eetirement of Preferred Stock to J. P. Morgan & Company.
Counsel for defendant have contended that the payment of the fifteen millions of dollars to J. P. Morgan & Company for the retirement of the preferred stock constitutes a past transaction, and in fact practically and legally amounts to an actual retirement. They cite Holland Trust Co. v. Sutherland, 177 N. Y., 327. The payment of the money to the trustee in that case was for the payment of interest maturing on coupons on bonds, and the conclusion reached in that ease was entirely proper. But that is materially different from this transaction, where the defendant has merely transmitted the money for the retirement of the preferred stock to its transfer agents. J. P. Morgan & Company must be considered as mere agents holding the money for the benefit of the defendant, and assurance should be given that the money shall be so kept and held or returned to the company.
The final conclusion is that the motion to dissolve the temporary restraining order is overruled. A temporary injunction is now allowed upon plaintiffs’ giving bond in the sum of $-, restraining the directors of the defendant from taking further steps to retire the preferred stock without the consent of a majority of alrfm-^-acMlQ^e'A;legally held and owned; restraining the defendant company from disbursing the money in the hands of J. P. Morgan & Company, and Yhtpjsing, that some proper arrangement be made with reference to that fund holding it intact upon proper interest until the further order of fig court; and restraining the defendant from in any wise recognizing the Chesapeake & Ohio Eailway as a stockholder.
The amendment to the petition offered during argument may now be filed.
Inasmuch as the judgment of the court is that there is not now a legally constituted board of directors, the necessity for some action either on the part of the corporation itself- or on the part of the court, looking to the temporary management and control of the corporation is now apparent. It_ was insisted by counsel for plaintiffs that the submission of the case *689 should be upon the application for receivership as well as all other matter. The court did not consider that question as such action will not be taken by the court when it can possibly be avoided, or unless in extreme cases of emergency. It has not been considered, excepting as incidental in making the other investigation; As stated, however, in Columbia, etc., Dredging Co. v. Dredging Co., 136 Fed., 710:
“Courts will not take the property of a corporation out of possession of' its owners at the suit of minority stockholders without there is. grave necessity therefor. * * * A receiver will be appointed where the majority stockholders are clearly violating the charter rights of the minority and putting their interests in imminent danger. * * * Such temporary receivership may be created where the corporation is entirely solvent, yet the- corporate officers by mismanagement or fraud are jeopardizing the property. This gives stockholders and creditors a right to complain and ask for a receivership.”
Davis v. U. S. Electric, etc., Co., 77 Md., 39, was a case much like the present- one. It was for ah alleged injury growing out of the control by one corporation of another. In the particular case, however, the stock ownership of the one corporation in the other was permitted by statute, and yet the court held in that case that a temporary receiver could be appointed although thére was no allegation that the company was insolvent.
This suggestion has been made and the authorities cited (and there aré many others of'similar import) to bring to the attention of counsel the situation as it appears to the court. The appointment of a receiver of the defendant is the last thing which this court would desire to do. It may be avoided by the action of the corporation itself,